UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| LINA MONIQUE GARZA, | § | |
| RICHARD MOJICA, INDIVIDUALLY AND | § | |
| ON BEHALF OF THE ESTATE OF | § | |
| EMILIO MOJICA, DECEASED, | § | |
| | § | |
| Plaintiffs | § | |
| | § | |
| V. | § | CIVIL ACTION: 2:21-cv-197 |
| | § | |
| CITY OF CORPUS CHRISTI, TEXAS; | § | |
| PHILLIP PETERSON, in his individual | § | |
| Capacity; ANTONIO CONTRERAS, in his | § | |
| individual capacity; ZAKQUERY RODGERS, | § | |
| in his individual capacity; AND | § | |
| JIMMY LEAL, in his individual capacity, | § | |
| | § | |
| Defendants. | § | JURY TRIAL REQUESTED |

## PLAINTIFFS' ORIGINAL COMPLAINT

Comes now Plaintiffs and respectfully state:

## I. NATURE OF THE ACTION

1. Emilio Mojica ("Mojica") was a Hispanic twenty-two-year-old male with mental health disabilities including depression. Mojica was physically unimposing standing 5' 5" tall and weighing 130 pounds. On October 13, 2019, City of Corpus Christi Police Officers, Phillip Peterson (hereinafter "Officer Peterson"), Antonio Contreras (hereinafter "Officer Contreras"), Zakquery Rodgers (hereinafter "Officer Rodgers"), and Jimmy Leal (hereinafter "Officer Leal") were called for assistance in getting Mojica to calm down during a mental health crisis and to return his grandmother's phone. These officers knew

1

they were not responding to a crime or attempting to effectuate an arrest. Rather, they knew they were responding to a non-emergency call for a mentally ill and emotionally disturbed individual to de-escalate the situation. The Officers responding to the call did not act with "measured and ascending actions" that corresponded to Mojica's behavior. Instead, within minutes of arriving on scene, each quickly escalated the situation by attempting to tase Mojica without cause and by shadowing Mojica approximately a block from his home to Cuiper Park and then, without lawful justification, Officer Peterson shot Mojica 3 times resulting in Mojica's death. Francisco Garza, Mojica's Uncle, who called the non-emergency number, stated during an interview, "Never in a million years that I would think that calling the cops to defuse the situation would end with my family member dead."

2. The use of force and deadly force against Mojica, under circumstances in which he was known to be mentally compromised, was grossly excessive and also the result of deliberately indifferent training and customs on the part of the City of Corpus Christi Police Department with respect to the handling of mentally ill, emotionally disturbed, or agitated individuals.

3. After a pattern of similar constitutional violations related to excessive force, especially involving mentally ill males of color, which are the predictable consequence of not having an adequate crisis intervention policy, training and excessive force policies, the City of Corpus Christi's final policymaking officials for the Police Department, the City

of Corpus Christi City Council[1] and Police Chief Mike Markle[2] failed to enact adequate use of force policies, training and crisis intervention to avert excessive force.

4.   Plaintiffs brings the following claims in this lawsuit which, to the extent that the claims are factually or legally inconsistent, are pleaded alternatively pursuant to Federal Rule of Civil Procedure 8:

> **Claims against City of Corpus Christi, Texas, a municipality,** by implementing, and failing to implement, policies, customs and practices which are the moving force behind violations of 42 U.S.C. §1983 - Fourth Amendment (Excessive Force – Unlawful Seizure/Wrongful Death) and violation of the Americans with Disabilities Act. Further, the City ratified the Officers' conduct at issue in this case after full disclosure of the facts showing that the Officer's conduct was within its policies, customs and practices.

> **Claims against Officer Peterson, in his individual capacity,** who was a police officer employed by the City of Corpus Christi, Texas acting under color of state law, for violation of §1983 - Fourth Amendment (Excessive Force – Unlawful Seizure/Wrongful Death) and violation of 42 U.S.C. §1983 - Liability in Connection with the Actions of Another - Failure to Intervene/Bystander Liability.

> **Claims against Officer Contreras, in his individual capacity,** who was a police officer employed by the City of Corpus Christi, Texas acting under color of state law, for violation of §1983 - Fourth Amendment (Excessive Force – Unlawful Seizure/Wrongful Death) and violation of 42 U.S.C. §1983 - Liability in Connection with the Actions of Another - Failure to Intervene/Bystander Liability.

---

[1] Pursuant to Part, I, Article I, Sec. 3 of the City's Charter.

[2] The City of Corpus Christi City Council has given the following authority to the Police Chief: responsible and accountable for the development, implementation and continuous improvement of all CCPD goals, objectives, policies, procedures and priorities of the department. Additionally, the chief assumes leadership and management responsibility for all departments, services, initiatives and activities in patrol, traffic, criminal investigations, special operations, internal affairs, and law enforcement. The chief also supervises the selection and training curriculum of new police cadets, field training for new police officers, enforces personnel policies, and standard operating procedures, local, state, federal regulations.

**Claims against Officer Rodgers, in his individual capacity,** who was a police officer employed by the City of Corpus Christi, Texas acting under color of state law, for violation of §1983 - Fourth Amendment (Excessive Force – Unlawful Seizure/Wrongful Death) and violation of 42 U.S.C. §1983 - Liability in Connection with the Actions of Another - Failure to Intervene/Bystander Liability.

**Claims against Officer Leal, in his individual capacity,** who was a police officer employed by the City of Corpus Christi, Texas acting under color of state law, for violation of §1983 - Fourth Amendment (Excessive Force – Unlawful Seizure/Wrongful Death) and violation of 42 U.S.C. §1983 - Liability in Connection with the Actions of Another - Failure to Intervene/Bystander Liability.

## II.  PARTIES

5. Plaintiff, Lina Monique Garza is the mother of Emilio Mojica and she resides within Corpus Christi, Nueces County, Texas.

6. Plaintiff, Richard Mojica, Individually and on behalf of the estate of Emilio Mojica, deceased, is currently a citizen of Texas and resident of Bexar County, Texas. Richard Mojica is the father of Emilio Mojica. He and Emilio Mojica's mother are the sole heirs of Emilio Mojica. Individuals who are within the class of people entitled to recover under Texas's wrongful death statute have standing to sue under Section(s) 1983 for their own injuries resulting from the deprivation of decedent's constitutional rights. Tex. Civ. Prac. Rem. Code Ann. Section 71.004; *Rhyne v. Henderson County*, 973 F.2d 386, 391 (5th Cir. 1992). The statute clearly recognizes the right of the surviving children and parents of the deceased to bring an action for the benefit of all. Therefore, Richard Mojica, as the surviving father of Emilio Mojica, is within the class of people entitled to recover. As to Emilio Mojica's estate: a) at the time of Mojica's death, he was not married; b) Mojica's

estate had no debts and/or fewer than two debts; c) Mojica died intestate; d) no administration of Mojica's estate is pending; e) no administration of Mojica's estate was necessary; f) no administration was desired by any interested party in Mojica's estate; g) Mojica died without owning any real property; and h) Richard Mojica and Lina Monique Garza are the sole heirs of Emilio Mojica and the only individuals who may receive under Texas law from Mojica's estate. Therefore, Richard Mojica has the legal right and capacity to bring this lawsuit both on his own behalf and on behalf of the estate of Emilio Mojica, deceased.

7. Defendant, City of Corpus Christi, Texas is a city located in the State of Texas. Pursuant to Tex. Civ. Prac. & Rem. Code Ann. §17.024 (b), service of process may be accomplished by serving its Mayor, Paulette M. Guajardo, at 1201 Leopard Street, Corpus Christi, Nueces County, Texas.

8. Defendant, Phillip Peterson, is a former City of Corpus Christi Police Officer and he is sued in his individual capacity. Peterson is a currently a citizen of Colorado and resident of Mesa County, Colorado and service of process may be accomplished by serving him at 410 Broken Arrow Drive, Unit B, Grand Junction, CO 81504 or, his place of employment: Mesa County Sheriff's Office, 215 Rice St, Grand Junction, CO 81501.

9. Defendant, Antonio Contreras, is a City of Corpus Christi Police Officer and he is being sued in his individual capacity. Contreras is a currently a citizen of Texas and resident of Nueces County, Texas and service of process may be accomplished by serving him at his place of employment: 321 John Sartain St, Corpus Christi, TX 78401.

10. Defendant, Zakquery Rodgers, is a City of Corpus Christi Police Officer and he is being sued in his individual capacity. Rodgers is a currently a citizen of Texas and resident of Nueces County, Texas and service of process may be accomplished by serving him at: 5410 Borden Circle, Corpus Christi, Texas 78413 or, at his place of employment, 321 John Sartain St, Corpus Christi, TX 78401.

11. Defendant, Jimmy Leal, is a City of Corpus Christi Police Officer and he is being sued in his individual capacity. Leal is a currently a citizen of Texas and resident of Nueces County, Texas and service of process may be accomplished by serving him at his place of employment: 321 John Sartain St, Corpus Christi, TX 78401.

### III. <u>JURISDICTION AND VENUE</u>

12. This Court has jurisdiction over this action by reason of 28 U.S.C. §1331 and §1343, because this action arises under 42 U.S.C. §1983 and the Fourth Amendment to the United States Constitution and the Americans with Disabilities Act as Plaintiffs seek to redress civil rights violations suffered at the hands of Defendants. Venue is proper pursuant to 28 U.S.C. §1391 because the events made the basis of this lawsuit occurred within the geographical boundaries of the United States District Court for the Southern District of Texas, Corpus Christi, Division.

### IV. <u>FACTS</u>

#### A. Mojica's death

13. Officer Peterson was a police officer with the City of Corpus Christi's Police Department (hereinafter "CCPD") from approximately March 12, 2015 until

approximately February 2021. Officer Peterson won an award for firearms proficiency in 2015 when he graduated from the CCPD Police Academy.

14. Officer Peterson identified "Uncle Sam's Misguided Children" as a former employer on social media. Uncle Sam's Misguided Children is identified by the Southern Poverty Law Center as an extreme anti-government group active since at least 2016.

15. Officer Contreras served for approximately three years with CCPD at the time of the incident made the basis of this lawsuit.

16. Officer Rodgers served for approximately one year with CCPD at the time of the incident made the basis of this lawsuit.

17. Officer Leal served for approximately one year with CCPD at the time of the incident made the basis of this lawsuit.

18. On October 11, 2019, an officer with CCPD issued a broadcast information for law enforcement only also known as a "BOLO" for 4330 Brentwood Drive, Corpus Christi, Texas 78415, which is Mojica's residence. The BOLO was issued by an officer allegedly because Mojica had made threats to commit suicide by cop. Based upon information and belief, the BOLO actually was for another person, but the officer entered the BOLO for Mojica instead.

19. A BOLO is important to distinguish because it places law enforcement on a heightened state of alert and it "pumps-up" the responding officer(s) in anticipation of what will be faced based upon the alert. The CCPD does not have a policy that a supervisor must review and approve a BOLO broadcast. CCPD's policy allows the decision to issue a

BOLO broadcast solely to the discretion of a police officer.

20. On October 13, 2019, Mojica had taken his grandmother's phone and would not return it. Therefore, Francisco Garza, Mojica's uncle, called the non-emergency police number.   Garza describes this call during an interview as follows, "I decided to call the non-emergency number to deescalate the situation while I was in route from fishing on the island hoping I could get here and the situation would be defused and we could talk."

21. Mojica was a twenty-two-year-old mentally disabled man who suffered from depression for several years. Mojica's depression was severe and, when active, it substantially limited his major life activities of performing manual tasks, seeing, hearing, eating, sleeping, speaking, learning, reading, concentrating, thinking, communicating, and working.

22. At approximately 2300 hours, Corpus Christi police officers were dispatched to the scene. While enroute, based upon the BOLO issued on October 11, 2019, Officer Peterson requested an additional unit and advised that Mojica had a bat and threatened suicide by cop. With this advisement and the non-emergency call initiating the dispatch, Officers Peterson, Contreras, Rodgers and Leal were aware that Mojica had diminished mental capacity. The Officers were "pumped-up" and anticipated the need for use of deadly force because of the BOLO issued on October 11, 2019 announcing that Mojica threatened suicide by cop.

23. Even if the BOLO was not properly issued relevant to Mojica, it placed the responding officers on notice that Mojica was experiencing mental health problems

8

because of the reference to suicide by cop. As well, CCPD was aware of Mojica's history of mental health problems because of previous calls to the residence due to Mojica's mental health disability.

24. Based upon information and belief, CCPD's crisis intervention unit, which offers services to de-escalate active situations caused by mental illness such as occurring with Mojica, was not dispatched because, pursuant to CCPD's policies, it did not operate after 11:00 p.m.

25. When the Officers arrived at the scene, Mojica was in front of his residence holding a child's t-ball baseball bat in his hands. The officers were on notice that no one was near Mojica when they arrived on the scene and he could not be a danger to anyone.

26. In full view of the Officers, Mojica had a children's t-ball bat, the bat was not raised and he was not threatening anyone with it.

27. This was an obvious crisis situation with a known mentally ill and agitated individual.

28. Officers Peterson, Contreras, Rodgers and Leal had, but did not take, the time to assess the situation and come up with a plan, information-gather, and engage in de-escalating tactics for this known crisis situation with a mentally compromised individual.

29. Rather than attempt to de-escalate the situation, Officers Peterson, Contreras, Rodgers and Leal surrounded and shadowed Mojica and shouted at him repeatedly aggravating Mojica's mental health conditions.

30. Officers Peterson, Contreras, Rodgers and Leal had time to make decisions that

would accommodate Mojica's mental health needs, such as engaging in non-threatening communications, and use of the passage of time to defuse the situation.

31. Officers Peterson, Contreras, Rodgers and Leal had time to take steps to calm the situation down rather than amp it up by deciding to walk quickly towards him with weapons drawn and pointed at him while all giving multiple loud commands.

32. Officers Peterson, Contreras, Rodgers and Leal could and should have assumed a non-threatening manner.

33. Officers Peterson, Contreras, Rodgers and Leal could and should have moved slowly and not continued to agitate Mojica.

34. Officers Peterson, Contreras, Rodgers and Leal could and should have continued to information gather from people at the scene including Mojica's family or attempt to communicate with Mojica from a safe distance.

35. Neither Officers Peterson, Contreras, Rodgers nor Leal called for backup or decided to involve people who they knew had more experience in crisis intervention with respect to mentally ill and highly agitated individuals, such as the SWAT team and/or crisis negotiators.

36. At no point, when Officers Peterson, Contreras, Rodgers and Leal observed Mojica did Mojica represent a danger to any officer or bystander. Rather, Mojica was simply despondent and suffering from the effects of his mental illness.

37. Mojica did not make any threatening movements or gestures toward the police or others.

38. Rather than calling or waiting for backup, retreating, or taking reasonable other actions to maintain the status quo or de-escalate the situation, despite knowing Mojica was alone, the officers, with their weapons drawn, recklessly proceeded to keep walking and close the considerable distance gap between themselves and Mojica, a distance that would have continued to provide them physical safety.

39. There was no need for Officers Peterson, Contreras, Rodgers and Leal to proceed in a hurried, threatening manner toward Mojica particularly when these officers had reason to suspect that doing so would force a confrontation resulting in death or serious injury because Mojica was experiencing a mental health crisis, highly agitated, holding a child's baseball bat, and unable to think rationally or exercise adequate control over his behavior.

40. Mojica was obviously highly agitated due to his mental health condition and was not dropping the children's t-ball bat or responding to verbal commands. Mojica's ability to reason was impaired significantly and he lacked the ability to make life decisions for his own health and safety.

41. Although there was time and opportunity, there was no attempt to call a supervisor to bring a beanbag shotgun.

42. Without legal justification, each of the Officers tased Mojica which was unsuccessful. This act was excessive and objectively unreasonable. Mojica was wearing a loose-fitting hoodie or similar garment which prevented the barbs from connecting. The officers should have known this from training. The officers did not act with "measured and

ascending actions" as required by clearly established law.

43.   Officers Peterson, Contreras, Rodgers and Leal again recklessly approached Mojica quickly and aggressively while yelling commands thereby escalating the situation, by aggravating Mojica's mental illness causing him to walk from his home toward Cuiper Park while the Officers tracked him. The Officer's actions were objectively unreasonable.

44.   Mojica removed his loose-fitting garment and was shirtless.   Although there was no legal justification for Mojica to be tased, none of the Officers attempted to tase him again while his bare skin was exposed. The tasers used by CCPD are more effective on bare skin. As well, none of the officers used pepper spray which was readily available.

45.   Next, inexplicitly and without justification, Officer Peterson fired a gunshot into Mojica's body while at or near Cuiper Park. After the first shot, it was clear to all officers that Mojica did not, and could not, pose a threat of serious physical harm to anyone. Mojica was clearly subdued. However, Peterson continued to fire two additional shots into Mojica which resulted in Mojica's death. None of the other Officers Contreras, Rodgers and Leal, considered Mojica a deadly threat as they did not discharge their firearms and they did not take action to stop Officer Peterson's excessive force against Mojica. From the time that Officers Peterson, Contreras, Rodgers and Leal arrived until the time that Mojica was shot, it was only a matter of minutes. Charges of aggravated assault on a peace officer were filed against Mojica to cover-up and justify the unlawful use of force.

46.   Peterson's shots into Mojica's body were excessive and objectively unreasonable. These shots entered Mojica's chest, abdomen and arm. No force, non-deadly

force, and much less force could have reasonably been used to get the situation under control rather than multiple shots to Mojica's body.

47. Francisco Garza, Mojica's uncle, stated during an interview, "Never in a million years that I would think that calling the cops to defuse the situation would end with my family member dead."

48. The Report of Postmortem Examination for Mojica stated that there was no soot or stippling on the skin for any of the gunshot wounds Mojica suffered supporting that the gunshots were not at close range. The Report also confirmed that there were no drugs (legal or illegal) or alcohol in Mojica's system.

49. After investigation and with full knowledge of the facts, final policymakers for the City of Corpus Christi, including the Chief of Police, returned Officers Peterson, Contreras, Rodgers and Leal to regular police duties with no discipline thereby ratifying their acts and supporting that their actions were within the policies, practices and customs of the CCPD.

### B. CCPD's Policy, Practice and Custom of Use of Excessive and/or Deadly Force When Not Legally Justified and in Non-Deadly Circumstances Especially Involving Mentally Ill Males of Color

50. The City of Corpus Christi Police Department has a practice and custom of utilizing excessive force and/or deadly force in non-deadly circumstances. This unlawful use of force is disproportionately against victims who are males of color experiencing mental health disabilities.

51. To demonstrate a municipal custom and practice under § 1983 in a failure to

train case, a plaintiff must allege a pattern of similar incidents in which citizens' constitutional rights were violated by intentional or negligent state action or that serious incompetence or misbehavior was general or widespread throughout the culpable agency. *Languirand v. Hayden*, 717 F.2d 220, 227 (5th Cir. 1983), *cert. denied*, 467 U.S. 1251 (1984).

52. A custom or practice of a municipality "includes the decisions of a government's law-makers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (citations omitted); *Peterson v. City of Fort Worth*, 588 F.3d 838, 850–51 (5th Cir. 2009). A city may be liable for an unwritten custom if "[a]ctual or constructive knowledge of such custom" is attributable to a city policymaker. *Hicks-Fields v. Harris Cty.*, 860 F.3d 803, 808 (5th Cir. 2017).

53. In support of the policy, custom and practice of utilizing excessive force and/or deadly force in non-deadly circumstances, the following are examples of a disturbing pattern of incidents that have taken place over the course of more than a decade of which the City's policymakers, being the City Council and Police Chiefs, had actual or constructive knowledge.  These customs and practices are attributable to these final policymaking officials especially as these final policymakers were aware of these incidents; these incidents involved formal reports required under local and Texas law which were either generated by or provided to the policymakers and several of these incidents included litigation of which these policymakers were aware and made decisions:

14

a. August 2, 2021: ER staff at Spohn South said that Felipe Viviano Garcia, a Hispanic male with mental health problems, appeared to be intoxicated or under the influence and had walked out refusing treatment. Corpus Christi Police Officers Cisneros and Montelongo were dispatched to the scene. Garcia was arrested for public intoxication, criminal trespass, and resisting arrest/search/transport. Cisneros wrote that Garcia was put into handcuffs and then began to resist arrest. He noted Garcia was not normal mentally or physically. Cisneros wrote, "While escorting the subject to the vehicle, he continued his resistive nature and in order to gain control he was placed against the back of the unit." Cisneros indicated that "placing" the man against the unit caused a dent near the passenger side back door. However, the custodial death report also indicates that Garcia struck his head on the passenger rear quarter panel. Garcia ultimately died, arguably from injuries caused by the officers.

b. Sept. 10, 2019: Justin Garcia, 24, a Hispanic male who was experiencing mental health issues, was shot by a Corpus Christi police officer around 8 a.m. in the 4500 block of Weber Road after officers responded to reports of a man yelling and swinging a pipe. Senior Officer William Hobbs discharged his weapon several times. Hobbs was placed on administrative leave and returned to full duty about six weeks later. Garcia was treated for his injuries. Hobbs had been involved in other excessive force claims as specified *infra* in paragraphs t and aa. A lawsuit has been filed related to this event, Civil Action No. 2:21-cv-00169, *Garcia, et al v. City of Corpus Christi, et al*, In the Southern District of Texas, Corpus Christi Division. This lawsuit is pending at the time of the filing of this pleading.

c. On March 26, 2019: Richard Salazar, a Hispanic male, was asleep on a couch in a breezeway attached to his house. A BOLO had been issued for a Mexican male wearing a white t-shirt. While asleep, Salazar heard voices telling him something and as he was trying to wake up, he heard popping sounds and felt excruciating pain in his torso and arm. When he awoke, he saw two police officers. Salazar had been shot with a gun although he committed no crime, had not threatened the police and, did not know the police were present. Nine shots were fired at Salazar from less than 10 feet. Four bullets struck him. Salazar was an unarmed stationary target and was shot with the intent to kill. Officers Gilbert Cantu and Jacqueline DeLeon acted with deliberate indifference in shooting Salazar. Officer Cantu previously shot and killed another person, identified in section d. below, not long before the Salazar shooting. $2.9 million was paid to settle Salazar's excessive/unnecessary force lawsuit. *Salazar v. City of Corpus Christi, et al*,

Civil Action No. 2:19-cv-00129, In the United States District Court, Southern District of Texas, Corpus Christi Division.

d. April 4, 2018: Corpus Christi police officers responded to a home invasion at 12:30 a.m. in the 2300 block of Capitan Drive. As officers were arriving, they saw four suspects leaving and shot one of them who was armed. The man, later identified as 34-year-old Adan Rene Marrero, a Hispanic male, died at the scene. The officers involved in the shooting, Senior Officer Gilbert Cantu, who has been on the force for six years, and Officer Gabriel Cantu, a five-year veteran were the officers involved in the shooting. They returned to full duty April 12, 2018. Officer Gilbert Cantu[3] was the same Officer that shot Salazar referenced in section c. above.

e. March 22, 2018: City of Corpus Christi police officers responded to a call about a subject, Gerardo Contreras, a Hispanic male who was displaying signs of mental illness and impairment, banging on the front door of a residence. Police officers arrived and attempted to take Contreras into custody. He was tased and handcuffed. Contreras became unresponsive, was transported to the hospital, and pronounced deceased the following day.

f. January 8, 2018: Stephen Ambriz, a Hispanic male, was at a friend's apartment. CCPD Officers appeared at the door about a "loud music" complaint. The complaint was not valid as there was no music or excessive noise. The officers took an aggressive tone. The lessee asked to speak to the officer's supervisor. An officer grabbed the lessee and threw him to the ground. Ambriz, asked the officers why they were arresting their friend. One of the officers stated he was being arrested for "PI" (despite being on his own property). One of the officers punched Ambriz in the face. Ambriz was thrown into/over a burning barbeque pit and struck so many times he lost count. Ambriz suffered multiple fractures of his jaw, spent several nights in the hospital, had facial reconstruction surgery, had his jaw wired shut for 6 weeks. The officers charged Ambriz with assault on a public servant and interference with public duties. Currently, there is no record of these charges with the Nueces County District Clerk. A lawsuit was filed, *Ambriz v. City of Corpus Christi, et al*; Civil Action No. 2:2020-cv-00004, Southern District of Texas, Corpus Christi Division. This lawsuit settled for $130,000.00.

---

[3] Officer Cantu worked as a security officer for West Oso ISD in his off-time and he resigned from this security officer position on March 18, 2021. This resignation of Officer Cantu from his West Oso ISD position came amid accusations of Cantu falsifying his timesheet with the school district.

g. October 19, 2017: Dewboy Lister, a Black 55-year-old male, was stopped by Officer Jose Hassette around 9 p.m. for not maintaining his lane and for having a broken license plate bulb. There was a short pursuit and then a scuffle, during which Hassette shot Lister in the abdomen. Lister died the next day. The Peace Officer Death or Injuries Report specifically stated that the victim [Lister] did not carry, exhibit or use a deadly weapon. Lister was charged with several crimes.

h. December 31, 2016: On December 31, 2016, Daniel Lopez, a disabled Hispanic male, decided to celebrate the New Year with his family. After enjoying a car ride to view holiday sites, Lopez returned home and was inside his minivan while his wife took their children inside. Lopez' disability includes the removal of a segment of his right lower limb below the knee. Lopez uses a prosthesis attached to his right leg which limited his ambulatory capacity. Unexpectedly, while inside his vehicle parked in front of his home at 5814 Cain Drive, Corpus Christi, Texas, Lopez was forcibly pulled out and thrown to the ground. None of the individuals involved identified themselves as Corpus Christi police officers. Lopez explained that his prosthesis leg was coming off. Leal was slammed against his mother-in-law's car causing his head to hit the car fender resulting in a concussion. Leal was handcuffed and told he had a warrant for a parole violation, which was not true. Leal tried to correct the situation. However, the officers arrested him and took him to the Detention Center where he was booked and held. Leal was released the following morning after Officer Gonzalez admitted that there was nothing on him and there was no reason to support or verify the claim that Leal had an outstanding active warrant for a parole violation. There was no probable cause for Leal's arrest. Lopez filed suit, *Lopez v. City of Corpus Christi, et al*, Civil Action No. 2:18-cv-00430, In the United States District Court, Corpus Christi Division and the case settled for $10,000.00.

i. Oct. 30, 2016: Jordan Love Gonzalez, a Hispanic male, was experiencing a mental health crisis and, at about 8:30 a.m., he was shot by a Corpus Christi police officer and died at Christus Spohn Hospital Memorial. Officer Lillian Pennick confronted Gonzalez and shot him, according to a Corpus Christi police news release. Gonzalez was charged with several crimes. Pennick is a field training officer and was working with her trainee, Officer Amber Buckelew, at the time of this incident. At a rally, Jordan's mother stated that the officers turned off their body camera prior to the shooting and that the officer that shot her son was rewarded by being promoted as a "top cop."

j. Nov. 23, 2015: Police shot and killed 49-year-old Henry Reyna, a Hispanic male experiencing mental health problems, after responding to an overdose call in the 5000 block of Concord Street about 12:01 a.m. A woman warned officers that "if cops show up, he will stab." A 49-year-old man with a knife confronted the officers. The officers used a taser, but that did not work. An officer then fired his weapon, striking Reyna in the torso and he died at the hospital. Senior Officer Christopher Simnacher and Officer Joshua Newman, both field training officers, were involved in the incident.

k. October 21, 2015: Corpus Christi Police and EMS responded to an accidental overdose call by the overdose victim, Mario Anthony Pedigone, a Hispanic male experiencing mental health problems. Pedigone stated that he didn't know what he drank and he felt like he was going to throw up and was hurting. Dispatch provided updates of the subject's location and that he sounded paranoid. Pedigone was located by Corpus Christi Fire Department (CCFD) Engine 7 in the roadway at McKenzie and Leopard around 0548 hrs. Engine 7 advised it was a PD matter and waited until CCPD arrived. Pedigone was contacted by CCPD in the grass median, in front of 10525 Leopard. Pedigone would not let Officers get near him and ran into traffic. When DPS Trooper arrived, Pedigone ran from the Officers towards McKenzie. The Officers and Trooper pursued on foot. Pedigone was taken into custody at the intersection of 10500 Leopard and 2900 McKenzie after a struggle. During the struggle, the DPS Trooper deployed his taser on Pedigone, once in the lower torso area and once on the leg area. Pedigone appeared to be hallucinating and was uncooperative with Officers and Fire Department Personnel as they tried to render aid. Pedigone stopped breathing and was transported to a hospital where he was pronounced dead at 0706 hrs.

l. May 4, 2015: Three officers shot a 21-year-old man while serving a mental health detention warrant on Jheryl Ray Mancillas in the 3800 block of Brookside Drive, Corpus Christi, Texas. Mancillas, a Hispanic male, was suffering from schizophrenia and bipolar disorder. Mancillas's mental health was deteriorating due to the loss of Mancillas's grandmother, discontinuation of his schizophrenia and bipolar medications, and the use of synthetic marijuana. Mancillas locked himself in a bedroom before appearing and pointed a handgun at officers police said. Police ordered Mancillas to put the gun down. When he refused, officers shot him multiple times, according to police. Mancillas was transported to Christus Spohn Hospital Memorial in critical condition.

m. February 19, 2015: According to a lawsuit, a group of 26 CCPD SWAT officers, accompanied by patrolmen, SWAT medical personnel, a command center, drones and an armored troop carrier called "the Bear", launched a "no-knock warrant" raid on the house located at 3001 Churchill, where the Rosas family lived. The Rosas family are Hispanic. This warrant was obtained by the lead narcotics officer Andy Trevino, who had conducted 12 drug buys ranging from $20 to $40 in two years from an adult Rosas grandson who did not reside at the Churchill address. Most of the pertinent information provided in Trevino's sworn affidavit to the judge (which had been approved by his supervisor) and to the SWAT team was either unverified or false. The home invasion by SWAT resulted in detonating an explosive flashbang device into the house, an exchange of gun fire and the wounding of three SWAT officers. Ray Rosas, a Hispanic male, was arrested and charged with, three counts of attempted capital murder. He remained in solitary confinement for approximately two years. The family essentially lost their home and were left destitute. The jury found Rosas "Not Guilty" on all counts. The Corpus Christi Mayor and City Council never sought to remedy this misconduct by its police officers or change policies and procedures relating to the use of force. The main culprit in the execution of this was faulty operation was Andy Trevino; yet he and the other officers involved were never disciplined or prosecuted. In fact, consistent with the City's and CCPD's custom and practice, Andy Trevino was promoted after the Ray Rosas trial to the DEA Task Force. The lawsuit filed is *Rosas, et al v. The City of Corpus Christi, et al*, 2:17-cv-00070 and the claims settled for $426,258.39.

n. February 15, 2015: This information is based upon pleadings filed in *Rosas, et al v. The City of Corpus Christi, et al*, 2:17-cv-00070. After receiving a telephone call from their 81-year-old mother that their house was under attack and that men were entering her home with rifles, Isabel Rocha and Brenda Rosas, who are Hispanic sisters, drove to the Churchill house. Prior to their arrival, a raid had ceased and the house and persons in the house secured. At gun point, the sisters were handcuffed and transported to the CCPD building to be interrogated for over an hour. Brenda Rosas, a mentally challenged person, was at times handcuffed to a wall at the police station.

o. September 14, 2014: During the morning hours Sammuel Toomey had several altercations with one of his neighbors, who was wielding a knife and threatening Toomey's life. Toomey called the Corpus Christi Police Department at least five times. The police came out to Toomey's home. After his final call to the police, the police told Toomey that if he called them back

one more time they were going to arrest him. Later that afternoon Toomey's neighbor again approached him, wielding a knife. Toomey was afraid to call the police due to the threat of arrest. Toomey did not know where to turn and Toomey grabbed his gun and shot at the neighbor that was threatening him, hitting three innocent bystanders. Toomey was arrested and taken into custody. Toomey was handcuffed, lying on his stomach, when he was tased by CCPD officers. The officers slammed him head first into the back of the vehicle. After Toomey was in the vehicle, he was transported to an undisclosed location where the officers met up and decided to beat Toomey causing numerous injuries to his body. Toomey was taken to the Nueces County Jail. When he was processed, Toomey stated that he was going to kill himself to the intake clerk. The staff at the jail was informed and aware that Toomey was suicidal. Toomey committed suicide. Sylvia Fuentes filed a lawsuit on behalf of Toomey's estate, *Fuentes, et al v. City of Corpus Christi, et al*, Civil Action No. 2:15-cv-00327, In the United States District Court, Corpus Christi Division and the case settled for $35,000.00.

p. December 29, 2013: Mary Zuniga, a Hispanic female, pulled into the driveway of her home when she was approached by Officers Tackett and Salinas for a minor traffic infraction. Officer Tackett removed Zuniga from the vehicle, put her in handcuffs and began searching her vehicle. The Officers found a prescription bottle that contained a syrup for Zuniga's children's cough.   Zuniga was placed under arrest and seated in the patrol vehicle. Officers Penick and Sanders arrived. Tackett forcefully removed Zuniga from the vehicle and threw her to the ground, telling her to "spit it out," claiming she had swallowed a controlled substance. Tackett proceeded to squeeze Zuniga's face, put his fingers in her mouth and forcibly holding her down. Zuniga kept telling the officers that she didn't have anything. Tackett, Salinas, Sanders and Penick began beating Zuniga and forcibly holding her on the ground with their knees in her back. Zuniga kept protesting telling the officers that they were hurting her and that she didn't have anything. Zuniga's neighbor witnessed the beating and told the officers that Zuniga is ill and has brittle bone disease. Zuniga began bleeding from her nose and her mouth. The officers then took Zuniga into the hospital where they gave her charcoal to make her vomit, and x-rays to determine the presence of foreign materials in her body. All tests were negative and no drugs found. Zuniga sustained numerous injuries to her body. The officers charged Zuniga with assault on a police officer and a jury acquitted her. Zuniga filed a lawsuit, *Zuniga v. City of Corpus Christi, et al*, Civil Action No. 15-cv-00503, In the United States District Court, Southern District of Texas, Corpus Christi Division, that was settled for $62,500.00.

20

q. November 15, 2013: German Roca, a Hispanic male, was sitting in his vehicle in his driveway enjoying a beer when he was approached by Corpus Christi Police Officers Flores and Janko. The Officers were responding to a call in regards to Roca's neighbors. Officers Flores and Janko arrested and charged Roca with Public Intoxication. The charges were later dismissed on December 18, 2014. After Roca filed a lawsuit, Roca v. City of Corpus Christi, et al, the City of Corpus Christi settled Roca's claims for a total amount of $11,500.00.

r. Dec. 10, 2012: Daniel Christopher Scott, who was suffering from mental illness, was shot and killed by Corpus Christi police officers outside his home in the 1100 block of Salem Drive. Scott called 911 to report feeling threatened by his neighbors, was armed and had barricaded himself inside.

s. May 21, 2012: Roderick Hornsby, a Black male, was with his friends at a game room. As they were leaving, they were approached by CCPD officers. Officer Morton questioned what they were doing. Hornsby's friend started to run for no apparent reason. Morton caught the friend and put him in handcuffs. Morton then slammed the friend to the ground, Hornsby started questioning as to why Morton did this. Morton told Hornsby to "get the fuck away" and to get in the middle of the street and he complied. Morton then told Hornsby to get on his belly and again he complied. Next, Morton handcuffed Hornsby and put him in the back of the police car. He was there for two hours. Hornsby was charged with disorderly conduct. Hornsby was taken to the City Detention Center. While there, Morton approached Hornsby and his friends and told them that this is going to happen every time he sees them whether he was in uniform or not. Hornsby said that he was going to internal affairs. Morton threw Hornsby to the ground face down and put his knee in his neck and his face. Hornsby was charged with "interference with a police officer" and "disorderly conduct." Hornsby sustained numerous injuries to his body. All charges against Hornsby were dismissed/dropped. Hornsby filed a lawsuit, *Hornsby v. City of Corpus Christi, et al*, Civil Action 2:13-cv-00231, In the Southern District of Texas, Corpus Christi Division, which settled for $45,000.00.

t. March 26, 2012: David Nunez, a Hispanic male, sued Senior Officer Hobbs. Nunez alleged that he attended a party at the Bayfront Plaza Hotel in Corpus Christi. He said he left the party in a vehicle driven by another person. Nunez said that he was seated in the front passenger seat with his younger brother in the rear seat. When the vehicle attempted to exit, Hobbs appeared

in the parking lot with other officers. After the vehicle passed Hobbs, and at a point where there was no life-threatening situation, Hobbs drew his Glock Model 22 .40 caliber gun and fired several shots into the rear window of the passenger side of the vehicle. Several of the bullets struck Nunez in his back and arm, causing severe injuries. Nunez underwent surgery. Nunez was ultimately released and not charged with any crime. The Court Docket Sheet for *Nunez v. William Hobbs, individually*, Civil Action No. 2:12-cv-00092, reflects that the lawsuit was settled on 04/28/2014 for $60,000.00.

u. March 6, 2012: Adam Balle was a forty-three-year-old Hispanic male who suffered from a disability to his back and was receiving social security disability benefits. Balle was an insulin dependent diabetic and he was able to ambulate. Balle was at his home when he and his wife got into an argument. Balle's wife called 911. When the Corpus Christi police officers arrived, Balle was sitting in his garage watching television. Two officers came to the area and grabbed Balle by the arm and yanked him from the chair. The television fell onto the Balle's lap. The officers pushed Balle onto the floor and handcuffed his arms behind his back. Balle was taken to the police vehicle. Balle was facing straight ahead towards the door of the car, when one of the officers told him to hurry up and get in the car. At the same time, another officer who was standing behind Balle, kicked him hard, two times in the middle of his back. As Balle went down, the officer then kicked him hard in the right side of his stomach. Both officers then pulled hard on Balle and sat him in the car. The second time that Balle was kicked, he felt a sharp pain like something snapped. The officers then transported Balle to the Detention Center, where he was held for a few hours. Balle was not offered any medical treatment at the time he was kicked nor during the entire time he was incarcerated at the Detention Center. A lawsuit was filed, *Balle v. City of Corpus Christi, et al*, Civil Action No. 2:14-cv-00066, Southern District of Texas, Corpus Christi Division which settled for $378,300.00.

v. February 12, 2012: Corpus Christi police officers were called to the home of Troy Marcus Stewart, a Black male who suffered from mental health issues. Police were called because he had allegedly become combative with paramedics. Officers and paramedics knew that Stewart suffered with severe diabetes and high blood pressure. He was in an altered state of mind. His blood sugar level had exceeded 500. Officers restrained Stewart by putting him on the floor and handcuffing him. Stewart began to regurgitate and stopped breathing, lost consciousness and died at a hospital.

22

w. September 11, 2011: Corpus Christi police officers pursued Tyree Sinclair Edwards, a Black male, on foot. Officers attempted to stop Edwards, but he jumped over a balcony railing, landing on a parked vehicle. Edwards continued to run. Officers were then able to stop Edwards and tased him to gain compliance. Edwards was placed in custody and officers realized that Edwards was not breathing. Edwards was then transported to a local hospital where he was pronounced dead.

x. March 10, 2011: Frank Barrientes, a Hispanic male, was outside of his home when his wife called to him that he had forgotten his breakfast. Barrientes ran back into his house to get his breakfast. Corpus Christi Police Officer Cantu was passing by Barrientes' home while he was in his car and apparently saw Barrientes run back into his house. Cantu made a u-turn and came back to Barrientes' house. When Barrientes came back out of his house, one of the officers was pointing what Barrientes at first thought was a gun at him, but later learned it was a taser. Barrientes asked "what the hell is going on?" Barrientes' wife and children came outside. Cantu asked Barrientes why he ran into the house and said he must be hiding something. Barrientes told Cantu that he was in a hurry to get to work and had forgotten his breakfast. Cantu continued to insist that Barrientes was hiding something so Barrientes, in an attempt to cooperate, gave them permission to search his house. Barrientes told Defendants that if they found anything he would take full responsibility. After searching Barrientes' house and finding nothing, Cantu continued to ask what he was hiding and insisting that he must be hiding something. Cantu grabbed twisted Barrientes' arm and pulled it behind his shoulder. Barrientes heard a popping sound. Cantu placed Barrientes in handcuffs and placed him under arrest. The officers told Barrientes "just to show you we don't fuck around." Cantu telephoned Barrientes' boss at Walmart and told him Barrientes was doing a side job for him and was running a little late to work. In arresting him, Cantu injured Barrientes' right shoulder and elbow. Barrientes was transported to the Emergency Room where he learned there was something wrong with the tendon in his elbow and he was instructed to seek therapy. Barrientes was held in a cell for approximately four hours. Barrientes was charged with disorderly conduct and given community service. A lawsuit was filed, *Barrientes v. City of Corpus Christi, et al*, Civil Action No. 2:13-cv-00059, Southern District of Texas, Corpus Christi Division which settled for $12,000.00.

y. December 20, 2011: Jack Johnson was arrested for tampering with evidence and transported to the Corpus Christi Police Department. During booking, an officer threw a shoe at Johnson hitting his left foot. Johnson

remained seated but asked why the shoe was thrown at him. The officer grabbed Johnson and threw him up against the wall very hard. The officers then threw Johnson to the floor, repeatedly kicked and beat him, pulled him by his feet and hands, causing bruises and abrasions to his legs, arms, torso and face. Johnson never did anything at all but lay there and take the beating. A lawsuit was filed, *Johnson v. City of Corpus Christi, et al*, Civil Action No. 2:12-cv-00036, Southern District of Texas, Corpus Christi Division which settled for $12,500.00.

z. September 11, 2011: Kristian Ramirez, a Hispanic male, was arrested for possession of marijuana and Xanax. He was transported to the Corpus Christi Police Department. During booking, Ramirez was in handcuffs behind his back standing against a wall. An officer grabbed and slammed him against the wall. Other officers began roughing up Ramirez. As a result of the officer's actions, Ramirez sustained bruises and abrasions to his head. A lawsuit was filed, *Ramirez v. City of Corpus Christi, et al*; Civil Action No. 2:12-cv-00035, In the Southern District of Texas, Corpus Christi, Texas which settled for $10,000.00.

aa. May 3, 2010: Nicholas Keith Lowry filed suit against Corpus Christi and Senior Officer Hobbs, *Lowry v. City of Corpus Christi, et al*, Civil Action C-10-122; In the Southern District of Texas, Corpus Christi Division. Lowry alleged that Hobbs attempted a traffic stop of his vehicle. Lowry was one block away from his residence. His girlfriend needed her nebulizer for her asthmatic condition. Lowry continued to his residence and pulled into his driveway. Lowry opened his door and raised his hands above his head to show Hobbs he was unarmed and not a threat. He also told Hobbs that his girlfriend was having trouble breathing and needed assistance. Without warning or provocation, Hobbs used his taser more than once against him. The lawsuit settled for $10,000.00.

bb. April 25, 2010: Fabian Pulido, a Hispanic male, was arrested and charged with Public Intoxication. During the arrest, in the middle of the street, after having the handcuffs placed on his wrists with his hands behind his back, Officers Luera and Humitz tackled Pulido and threw him to the asphalt, causing abrasions to his face. When Pulido asked why the Officers were beating him, they said he was resisting; however, no charge was ever filed against him for resisting. A lawsuit was filed, *Pulido v. City of Corpus Christi, Texas, et*, Civil Action No: 2:12-cv-00076, in the Southern District of Texas, Corpus Christi Division. The lawsuit settled for $17,500.00.

24

cc. April 15, 2010: John Michael Hogan received a call from his minor son who lived with his ex-wife in Portland, Texas. Hogan's mother had known mental health issues and his son indicated that his mother was acting erratic. He requested Hogan pick him up. Upon arrival, officers from the Portland Police Department contacted Hogan and explained that his ex-wife was going to be arrested. The Portland officers released Hogan's son to him. On April 15, 2010, Hogan was startled by a loud banging at his front door. Hogan's roommate answered the door to find Corpus Christi police officers Cunningham and Potter. Hogan's roommate opened the door. The officers asked if he was John Hogan and demanded entry into the residence to enforce a divorce decree. Hogan informed the officers that he was Hogan and they did not have permission to enter. Without warning or provocation, the officers busted through the door and tackled Hogan to the floor. The officers were on top of him and he felt pain in his torso. The officers kept their weight on top of Hogan, a lung cancer survivor, as they placed him in handcuffs, causing him to have trouble breathing. Thereafter, the officers transported him to jail. Hogan was arrested and charged with assault on a peace officer. This charge was not pursued by the Nueces County District Attorney's Office. As a result of the officer's actions, Hogan sustained two broken ribs and development of pneumonia due to his pre-existing medical condition (lung cancer). A lawsuit was filed, *Hogan v. City of Corpus Christi, Texas, et al*, Civil Action No: 2:10-cv-00360, in the Southern District of Texas, Corpus Christi Division. The lawsuit settled for $20,000.00.

dd. November 11, 2009: Herman George Knabe, was riding his bicycle in the 2500 block of Airline, allegedly swerving into traffic. A Corpus Christi police officer asked Knabe to move out of traffic. Knabe proceeded on his bicycle to the 6300 block of Wooldridge. The officer followed and attempted to pat down Knabe. Knabe began to resist. Other officers arrived and Knabe was tased and pepper sprayed. Knabe stopped breathing. After being transported to the hospital, Knabe passed away. The custodial death report stated that Knabe died from a myocardial infarction due to underlying illness, as well as the physical struggle. The manner of death was listed as "other homicide."

ee. September 5, 2009: Pedro Cortez Gonzalez, a Hispanic male, contacted the Corpus Christi Police Department regarding a dispute he had with his father. Officers Hullum and Freeman were dispatched. Gonzalez and Gonzalez's father advised the officers upon arrival that there was no longer a dispute and they no longer needed assistance. The officers were agitated. Without warning or provocation, Freeman tased Gonzalez. Gonzalez lay

stunned on the ground and Freeman cycled the taser two more times. The officers placed him in hand restraints and arrested him. The officers drove Gonzalez to an alley. Gonzalez heard the officers say, "which one of us is going to do it" and "do you want to do it" as they put on gloves. Freeman drew his gun and clinched it with his hands in front of him. Gonzalez was fearful the officers were going to kill him. Without warning or provocation Hullum struck Gonzalez across the face and unleashed a stream of pepper spray into Gonzalez's face and closed the door. As Gonzalez gagged, Hullum opened the door, unleashing another stream of pepper spray and closed the door. The officers dragged Gonzalez out of the vehicle and slammed him to the ground; placed a spit bag over his face and put him in leg shackles. The officers took turns delivering blows to Gonzalez's head and torso. Blood began to spill out of Gonzalez's head. Hullum and Freeman told paramedics that Gonzalez did not need medical treatment. On the way to a transport van, Hullum and Freeman slammed Gonzalez to the asphalt causing his face to strike the asphalt. Freeman jumped into the back of the van and punched Gonzalez. Hullum and Freeman fabricated criminal charges against him. Two charges of assault bodily injury resulted in not guilty verdicts by a jury and a charge of resisting arrest, search or transport was dismissed by the Nueces County District Attorney's Office. Gonzalez filed a lawsuit, *Gonzalez v. City of Corpus Christi, et al*, C-10-321, In the Southern District of Texas, Corpus Christi, Texas which settled for $40,000.00.

ff. May 9, 2009: Sylvester Villasana, a Hispanic male, was shot and killed by an officer in a vacant lot on the corner of Port and Dillon avenues. Police said Villasana was holding a cellphone in one hand and an open folding knife in the other.

gg. October 1, 2008: Claudius Alexander, a Black male, was operating his motor vehicle in Corpus Christi, Texas. Alexander was driving near Morgan Avenue when he began to feel ill. Alexander had four prior back surgeries, was diabetic, suffered from a seizure disorder and had high blood pressure. Alexander was forced to pull his vehicle over to the side of the road. As Alexander tried to regain his composure, he was approached by Corpus Christi police officers who tased him. The officers then threw Alexander to the ground. The officers continued their assault and again shot him with their tasers until he lost consciousness. When Alexander regained consciousness, he was confronted by the officers accusing him of being on drugs and/or under the influence of alcohol. When Alexander informed the officers of his medical conditions, emergency medical services were contacted. Alexander's blood sugar was found to be well below a normal range. The

officers arrested Alexander for evading arrest/detention and driving erratically. Alexander requested further medical treatment that was denied. Upon arriving at the Detention Center, Alexander informed officers that he required medical attention. Eventually, other detainees had to inform officers that Alexander was losing consciousness. Alexander was unable to stand and he was soon released without being formally charged. Alexander filed a lawsuit, *Alexander v. City of Corpus Christi, et al*, Civil Action No. 2:10-cv-00120, In the United States District Court, Southern District of Texas which settled for $5,881.00.

hh. December 3, 2007: On December 3, 2007, police responded to a call for service regarding an assault with injuries at 9809 South Padre Island Drive, Corpus Christi, TX. Upon arrival officer observed one male, Richard Lee Parr, leaving the area and another male was taken into custody. The assault victim was contacted and described the subject leaving the area as a suspect as well. Moments later (12/4/07, 12:05am) the male that left the area, Parr, was observed in an empty lot and attempted to flee from officers. Officers gave chase and attempted to take Parr into custody. Parr resisted and fought with the officers. Officers sprayed him with pepper spray to gain compliance. Parr continued to resist and struggle with the officers; the officers found it necessary to strike Parr on the right shoulder with an ASP baton and also apply a knee strike to Parr's left hamstring. Parr was handcuffed and rip hobbled and the officers requested EMS for the purpose of checking on his health and assisting with the decontamination of his eyes (due to pepper spray). A spit hood was also utilized. While enroute to a nearby location to meet EMS, the Parr became quiet and unresponsive. Parr was transported to the hospital where he was pronounced dead at 1:00 am (12/04/07.)

ii. May 7, 2006: At about 2:20 a.m. Corpus Christi police officers responded to a disturbance call at the Modern Motel 3421 S. Padre Island Drive, Corpus Christi, Texas. The caller advised that a female hit her, Dougressa Elaine Crawford, who is Black, stole her phone and was beating on the office door. Responding police officers located Crawford at the back of the motel complex banging on a door and in an agitated state. She was sweating and frothing at the mouth. Upon seeing the officers, Crawford walked back and forth saying I want my fucking money back. The officers attempted to talk with her, but she did not respond. The officers suspected she was under the influence of drugs and attempted to escort her to a police car. She struggled with the officers and was taken to the ground. Once on the ground she continued to struggle and kicked one of the officers in the eye.

The officers gained control of Crawford's arms and handcuffed her. The officers called EMS and, while waiting, an officer restrained her on the ground. Crawford spit on an officer and attempted to grab his groin. Officers placed a hobble restraint around her knees and moved her to a seated position. The officers then placed a spit mask on her face. When EMS arrived at the scene, Crawford was still struggling and was handcuffed to the gurney for transport to the hospital. While enroute to the hospital by ambulance, Crawford went into cardiac arrest. She was admitted to a hospital and died the following day, May 7, 2007 at 7:30 p.m.

jj. August 25, 2006: On 8/25/2006 at about 9:49 pm, police and EMS responded for a male assault victim at Club Toxic 5820 S. Staples Corpus Christi, Texas. The victim, Elcide Gabriel Sylve, a Black male, was described as having a big cut on his hand. Police were told that Sylve had fled prior to their arrival. Police and EMS searched for the victim, but were unable to locate him. At about 10:08 p.m. police responded to a call for service at 5825 Woodhaven Corpus Christi, Texas. The caller advised that something was being thrown at a window. Responding officers checked the exterior of the home and entered the backyard to investigate and located a male lying on the ground. The male was Sylve and he smelled of alcohol and officers attempted to take him into custody. The male resisted and the officers sprayed him with pepper spray. Sylve was then handcuffed and officers noticed he matched the description of the assault victim from Club Toxic. While observing the male, the officers noticed that he was not breathing. Sylve was transported to the hospital where he was pronounced dead at 11:04 p.m.

kk. July 29, 2006: Corpus Christi police officers responded to three related calls for service. All three calls involved the same male subject and were received within a three-minute period. The first call was for a panic alarm at the Speedy Stop store at 3955 S. Padre Island Dr. A Hispanic male, Sergio Martin Garcia, ran into the store stating that someone was chasing him and he needed to hide. He locked himself in the back hallway. The store clerk was unable to get him out and pushed the panic alarm. Garcia ran out the rear emergency exit activating the door alarm. The second call was for a possibly intoxicated, Garcia, walking on Weber Road and jumping in front of vehicles. The third call was for a disturbance at 4009 Manhattan Drive. The caller stated that Garcia entered their residence and was refusing to leave. The caller described the male as possibly being intoxicated and stated that he was now walking towards Weber Road and Manhattan Drive. The caller then advised dispatch that they were holding Garcia down. The first

arriving officer saw several persons standing around Garcia and one kneeling by him. Garcia was lying face up, was breathing heavy and his eyes were open. The officer found him to be unresponsive and called for EMS. When EMS arrived, Garcia became combative and several persons assisted police in rolling him over so he could be handcuffed. He was placed on a stretcher and taken to an ambulance. As Garcia was being taken to the ambulance, police and EMS noticed that he appeared blue and did not appear to be breathing. Garcia was transported to the hospital where he was pronounced dead at 1:21 a.m.

ll. May 20, 2006: Corpus Christi police officers responded to a call for service regarding a suspicious female, Madeline Garcia, a Hispanic female, dressed in black. Garcia was reportedly walking back and forth, and jumping on and climbing light poles in the area of Ocean Drive and Morgan Ave., Corpus Christi, Texas. The arriving officer saw her as she was climbing a light pole high enough to touch the top of the speed limit sign. The officer made verbal contact with her to see if she needed help, but she did not respond. The officer followed the female to a nearby convenience store where he waited for another officer to assist. The second officer arrived and entered the convenience store and made contact with her. It was apparent she was agitated and as he attempted to calm her, she exited the store. Both officers attempted to detain her on suspicion of public intoxication in the parking lot. When the officers attempted to handcuff her, she physically resisted and was taken to the ground. As she continued to resist being handcuffed, the officers sprayed her with pepper spray in order to gain compliance. She continued to resist, but was finally handcuffed. As she was being escorted to the police car, she dropped to her knees and refused to get into the police car. An additional officer was called to the scene for assistance. As officers were attempting to place the female in the back seat of the police car, she continued to resist. The officers secured her legs with leg irons and a rip hobble to prevent her from injuring herself or others. After approximately one minute, the officers noticed that she appeared to be unconscious. EMS arrived and began providing treatment. Garcia was transported by EMS to Spohn Shoreline Hospital where she was pronounced dead at 1:20 a.m.

mm. September 19, 2005, Corpus Christi police responded to a series of calls for service regarding a suspicious male, Gilberto Limon, who was shouting and pounding on doors on the 3900 block of MacArthur Street, Corpus Christi, Texas. Officers contacted Limon, a Hispanic male, and attempted to pat him down for weapons. He resisted and the officers sprayed

him with pepper spray to gain his compliance. Limon continued to struggle with officers to such an extent that the officers found it necessary to administer strikes with an ASP baton to the males lower legs for the purpose of gaining his compliance. Limon was then handcuffed and the officers called EMS for the purposes of checking on Limon's health and assisting with the decontamination of his eyes (due to the pepper spray). While being treated by EMS, Limon became quiet and his pulse ceased. Limon was transported to Spohn Memorial Medical Center where he was pronounced dead at 2:11 a.m.

nn. May 30, 2001: Around 9 a.m., Corpus Christi Police Officer John Lay shot and killed a 54-year-old homeless man who allegedly lunged at him with a knife while allegedly experiencing mental health issues. The officer reported he was filling out reports in his car when the man, who was not identified, approached him with a kitchen knife and shouting profanities. The man refused and lunged at the officer with the knife, and the officer fired one shot. the man died at the scene.

54. The City did not specifically train officers about these events or alter its training as a result of these events.

### C. CCPD's Policy, Practice and Custom to Quickly Resolve Calls is the Moving Force Behind Officer's Use of Excessive Force Including Deadly Force

55.   In October 2019, CCPD had a policy, practice and custom implemented through final policymaking officials that its police officers were to quickly resolve calls in order that the officer may move onto the next call. This policy, practice and custom is the moving force behind constitutional violations of excessive force because it causes the responding police officer(s) to escalate the situation to bring the call to a quicker conclusion as in Mojica's case wherein from the time of arrival to time of the use of deadly force was minutes.

56. Acknowledging the problems with this policy, CCPD Assistant Chief Mark

Schauer told the Corpus Christi Caller Times on August 28, 2020, "If we try to approach someone too quickly, it escalates," he said. "It's meant to (teach) how are you going to react to what's going on, in addition to calling not only a supervisor but another officer. See what's going on, maintain distance, stage." Schauer described today's law enforcement response as a paradigm shift. A typical response, he said, used to be responding and resolving a call as quickly as possible to get to the next call for service. "We need to slow it down and take more time and not worry about clearing up and going to the next call," Schauer said. "We can't do that with these situations. We have to take our time."

57. Mirroring what Assistant Chief Schauer stated, in another interview with the Corpus Christi Caller Times on June 6, 2019, Amber Buckelew, the only full-time Crisis Intervention Team officer, told the Caller Times about the Crisis Intervention Team, "You got to take your time. Police are usually like let's get in, let's get it done and let's move on. Whereas, we have to be very thorough," she said. "There's a lot of repeating yourself. There's a lot of just slowing things down." It is important to note that Officer Buckelew was one of the officers who responded to the incident where Jordan Love Gonzalez was shot while experiencing a mental health crisis which is discussed in paragraph 53. i. *supra*.

58. CCPD was working under the former policy, practice and custom of working calls quickly at the time of Mojica's death.

### D. CCPD's Policy, Practice, Custom, History of Providing and Permitting Warrior/Killology Training is the Moving Force Behind Police Officer's use of Excessive Force Including Deadly Force

59. CCPD has offered training to its officers through Police1 Academy since at least

2013. The decision to offer this training has been made by final policymaking officials including former Chief of Police Floyd Simpson and Chief of Police Mike Markle. Police1 Academy is an online video training system that offers more than 1500 videos and courses, that can be viewed anytime. In addition, Police1 offers articles, news, products and other services. City of Corpus Christi Police Officers may choose the courses and other services that they wish to take under this program.

60. From at least 2013 to present, CCPD permitted officers to receive "Killology" or "warrior style" training through Police1 Academy and Police1, which is discussed in detail below.

61. The City of Corpus Christi's commitment to the Police1 Academy is clear as Police1 Academy uses the City of Corpus Christi on their training website:



62. Police1 Academy features the City of Corpus Christi as one of four "clients."



Police1 Academy also uses a quote from Captain Billy Breedlove, Director of Training, CCPD, "We believe that the PoliceOne Academy's online training is an excellent way to augment a training program and produce a culture where "every day is a training day". Additionally, the staff has been great in supporting our launch."



"We believe that the PoliceOne Academy's online training is an excellent way to augment a training program and produce a culture where "every day is a training day". Additionally, the staff has been great in supporting our launch."

– Captain Billy Breedlove, Director of Training

Corpus Christi Police Department, TX

63. Police1 Academy boasts that their services utilize the knowledge of well-known Law Enforcement Officer trainers like Dave Smith and Lt. Col. Dave Grossman (hereinafter "Grossman").

64. Smith uses the name Dave "JD Buck Savage" Smith and he frequently appears together with Grossman at police conferences, engagements and training.

65. Grossman defines "killology" as, "The scholarly study of the destructive act, just as sexology is the scholarly study of the procreative act. In particular, killology focuses

33

on the reactions of healthy people in killing circumstances (such as police and military in combat) and the factors that enable and restrain killing in these situations." Killology Research Group, www.killology.com. Grossman teaches officers to consider every person and every situation as a potential deadly threat and to kill "less hesitantly." This school of thinking is also known as warrior mindset in policing. Grossman's philosophy is that killing of one human being by another is not natural and this natural instinct must be overcome by the warrior. He also instructs that training to kill by repeated practice actions allows the officer, a.k.a. "warrior" to act without thinking or to be on "autopilot." Grossman, is quoted as saying, "The sense of personal effectiveness and self-confidence created by realistic training is as much a stress reducer as when the muscles go on autopilot." Police1 also includes recommendations to Grossman's books such as, On Combat and The Bullet Proof Mind.   The police officers employed by the CCPD since 2013 to present had available to them warrior/killology training through their employment by way of Police1 Academy and Police1. Further, both before and after October 2019, CCPD did not have a policy prohibiting police officers from receiving warrior/killology training.

66. Grossman has frequently stated while training police, that if you fully prepare yourself, in most cases, killing is just not that big a deal.

67. Police1 also published a training video of Grossman entitled, The sheep, the wolf and sheep dog on Jan 24, 2013 which remains on their website in which Grossman advocates, relative to police training, going into combat with a "self-fulfilling prophecy."

68. Self-fulfilling prophecy is defined by Merriam Webster as:  becoming real or true by virtue of having been predicted or expected. Merriam-Webster, https://www.merriam-webster.com/dictionary/self-fulfilling.

69. A self-fulfilling prophecy of "combat" teaches police to look for a "gunfight" and teaches that the use of deadly force as an "ultimate achievement of [a] lifetime, the pinnacle of a lifetime of preparation…yearns for that opportunity…"   This training teaches the officer to be less hesitant to use force against the "bad guy" contrary to using "measured and ascending actions" as clearly required by *Poole v. City of Shreveport*, 691 F.3d 624, 627 (5th Cir. 2012) citing *Galvan v. City of San Antonio*, 435 Fed.Appx. 309, 311 (5th Cir. 2010). Grossman states, translated as closely as possible, in The sheep, the wolf and sheep dog:



"I talk about the sheep, the wolf and the sheep dog. And I can't tell you how

many people that come up to me over the years, and said, "You know I always thought there was something wrong with me. All my life, people told me I was a wolf, I'm not a wolf. I would never harm the flock. But I yearn for a righteous battle. I yearn for an opportunity to use my skills. The sheep are all those kind decent gentle creatures who can only hurt you if by accident or extreme provocation. The wolf will feed on the sheep without mercy. Then there's the sheep dog. The sheep dog is a predator too. The sheep dogs is a mediator too. It takes a predator to hunt a predator. But that sheep dog. If you have no propensity for violence in your non-violent citizen. If you have a propensity for violence in an absence of empathy, violence without any emotion for others is a pretty good definition of aggressive sociopath or, or a wolf. But what if you had a propensity for violence, and a love for the lambs. What if you have spent a lifetime nurturing the capacity for violence, and a desire to use it in a righteous battle. You know the sheep heard about the 911 hijackers, they said, Thank God I was not that plane. The Sheepdog heard about the 911 hijackers they said I wish I was on that plane. Maybe I could have made a difference, and that's that mindset and the amazing thing is that the sheepdog, they're not destroyed by combat. They thrive in it, but we have got to go into combat with what I call a positive self-fulfilling prophecy. People have scripts in their mind and if, if you get in a gunfight, and you say you oh my god, my life is gonna go to hell, I had to kill this guy everything's gonna be shit, then that's a mental program you just gave yourself. My life's gonna go to hell, everything's gonna go to shit. Most people will tell you in private. One on one, that when I had to shoot that bad guy. It was the culminating achievement of a lifetime of preparation. I use my skills in a life and death event to stop a deadly force threat, and to save lives and to stop a bad man. It was the ultimate achievement of my lifetime, the pinnacle of a lifetime of preparation. It was a moment of great adrenaline and achievement, and all my training came together and it was one of the greatest moments of my life. If you think about going into combat that way and the sheep dog does, the sheep dog yearns for that opportunity, then, then when combat comes you're not destroyed. You got a positive self-fulfilling prophecy. And it's so important that we don't sink in what I call the pity party. So we have this positive self-fulfilling prophecy as we go into combat. The sheep dog they yearn for that righteous battle and when the moment comes. They thrive on it they take pride in it, and they get on with their lives and are able to sustain themselves and be triumphant and stronger from their experience.

70. High-ranking officers and agents of the CCPD, encouraged all officers to receive

36

police training, including warrior mindset and style, by making it available through Police1.

71. The City of Corpus Christi was aware that its officers had the opportunity to receive and received warrior/killology training before and through October 2019, but did nothing to prevent officers from receiving it or re-training officers who had received it.

72. The City of Minneapolis, Minnesota allowed warrior/killology training.  On April 18, 2019, Minneapolis Mayor Jacob Frey announced that the city banned its police officers from participating in "warrior-style" training, even when it's self-funded and off duty. The City of Corpus Christi has not undertaken such action and, to the contrary, continues to promote and allow warrior/killology training of its police officers through Police1.

73. Further, the City of Corpus Christi, through its final policymaking officials, City Council, former Chief of Police Simpson and Chief of Police Markle, are aware that there have been a series of constitutional violations of excessive force, especially as to mentally ill male minorities, making the need to stop warrior/killology training obvious. The examples of prior incidents are pleaded and identified *supra* in paragraph 53. In light of the warrior/killology training, the pattern of constitutional violations of excessive force including, but not limited to those cited in paragraph 53, demonstrate that the City of Corpus Christi, through its final policy-makers, were deliberately indifferent to its citizens' constitutional rights relative to excessive force.

74. Further, the need to ban warrior/killology training by CCPD officers was

obvious at the outset because it actually teaches and instructs the police officer to kill less

hesitantly and to fulfill a prophecy to use his or her training to kill. This training is the

moving force behind and resulted in unconstitutional excessive force being used against

Mojica and other citizens as set-out *supra*.

### E. CCPD's Policy, Practice and Custom of Inaction and Failure to Provide Policies, Equipment and Training to Police Officers to Handle Recurring Mental Health Situations is the Moving Force Behind Officer's Use of Excessive and Deadly Force

75. CCPD Assistant Chief Mark Schauer gave an interview to the Corpus Christi

Caller Times published on August 28 and 29, 2020, approximately 10 ½ months after

Mojica's death, which supports that CCPD had knowledge of recurring mental health

issues of citizens and policing prior to Mojica's death in October 2019. As well, in the

interview Assistant Chief Schauer also identified how CCPD policies needed to be changed

and how some policies were changed related to reducing force and deadly force including

shootings – which occurred after Mojica's death. The article reads:

### <u>CCPD Takes Steps to Reduce Shootings</u>

Corpus Christi Police Department Assistant Chief Mark Schauer knows time is of the essence when it comes to saving lives.

By that he means officers should take all the time they need to defuse a situation. It can mean the difference between life and death.

That approach takes on added significance in light of recent news events that have put policing, and the ways officers interact with the public, under the microscope.

"One of the things going on in the country is shooting unarmed people. Now we're having more and more folks on drugs or having mental episodes, and

38

we have a number of them that sometimes are not armed," Schauer said.

Last fall, Schauer said, the department created a de-escalation task force to examine ways to apply better techniques when responding to those types of calls.

"One of the obvious things was training. Better training to teach people more skills, how to slow things down with people who are having episodes," he said.

Schauer, along with help from officers on the task force, rewrote the department's de-escalation policy. The policy was rewritten to provide instruction for officers, supervisors, dispatchers and others who become involved in a situation that needs to be de-escalated.

The department has already seen successful outcomes from taking time to talk to people.

A few months ago, Schauer said, an officer spent about an hour speaking to a man holding a knife.

"He finally dropped it. It's very impressive," Schauer said. "(The officer) just took his time and talked to him. He established a rapport with him and got him to drop the knife, and took him into custody, without a struggle."

All officers in the department also took an eight-hour training course, "Integrating Communications, Assessment and Tactics." The training is a use-of-force course designed to train officers how to respond to calls involving unarmed people behaving "erratically and dangerously," according to the course's website.

Officers also discuss less lethal use of force. The department has pepper spray, pepper ball ammunition and Tasers. Those less lethal weapons may not always be effective, Schauer said.

The department has invested in 40 millimeter launchers. The firearm-like weapon launches a sponge-like projectile that can be fired from close range, Schauer said. The projectile could potentially knock someone down.

"We are assigning them to officers to take in patrol cars and have that as a resource so they don't have to shoot someone," Schauer said.

Police academy cadets are also getting new training in de-escalation. Though de-escalation techniques have long been taught in the police academy, this class of cadets will utilize the latest training technology.

In June, cadets began using a training simulator. The $140,000 simulator has three big TV screens that help train for different scenarios.

The Corpus Christi Police Foundation bought the simulator with funds raised through annual fundraisers, business and personal donations, Cissy Garcia, executive director of the police foundation, said in a statement.

The department uses the simulator to build verbal skills and slow things down, Schauer said.

"If we try to approach someone too quickly, it escalates," he said. "It's meant to (teach) how are you going to react to what's going on, in addition to calling not only a supervisor but another officer. See what's going on, maintain distance, stage."

Schauer described today's law enforcement response as a paradigm shift. A typical response, he said, used to be responding and resolving a call as quickly as possible to get to the next call for service.

"We need to slow it down and take more time and not worry about clearing up and going to the next call," Schauer said. "We can't do that with these situations. We have to take our time."

This isn't the first time the police department has addressed mental health issues in the city.

Last year, the department established its Crisis Intervention Team. The team consists of an officer trained in crisis intervention and a mental health worker. The team rides in a marked department vehicle and responds to calls for service involving people who may have mental health issues.

The team attempts to keep people with mental health issues out of the criminal justice system and divert them to treatment and other programs.

76. Unfortunately, CCPD's final policymakers were aware before October 2019 to

a moral certainty that their police officers would be required to interact with, seize and/or arrest mentally disabled and mentally unhealthy individuals such as Mojica. This is clear from the examples of prior incidents identified *supra* in paragraph 53 and also supported by Assistant Chief Schauer's interview in August 2020 and Officer Buckelew's interview in June 2019. Despite this knowledge, CCPD's final policymakers did not change its policies and training, specified in the August 2020 interview of Assistant Chief Schauer as set-out in paragraph 73, until *after* Mojica's death.

77. Since 2013 to present, CCPD has offered, allowed and condoned warrior/killology training through Police1 and other sources which contradicts policies that may have existed related to "slowing things down" and other policies related to mental health related calls. The failure of CCPD to ban its police officers from participating in "warrior-style" training, even when it's self-funded and off duty nullifies and opposes any training that an officer may receive related to de-escalation and handling mental health related calls. This failure is the moving force behind the constitutional violations of excessive force under the Fourth Amendment as occurred to Mojica and others similarly situated.

78. Further, CCPD final policymakers failed to provide specific tools to police officers to handle recurring situations involving mentally ill citizens which it knew to a moral certainty would occur. Specifically, the CCPD enacted as policy the use of 40-millimeter launchers as referenced in the interview with Assistant Chief Schauer in August 2020. These launchers have been commonly accepted as appropriate less lethal force in

policing especially involving mentally ill citizens. However, despite knowing that to a moral certainty police officers may have to face mentally ill citizens who may be carrying a knife, bat or other item that may be a "weapon" and these individuals may need to be disarmed, the CCPD chose not to provide 40-millimeter launchers to police officers that may safely disarm a mentally ill citizen such as Mojica in October 2019.

79. As well, despite knowing that to a moral certainty police officers may have to face mentally ill suspects threatening suicide by cop (which assumes the use of some force by the suspect to provoke the suicide), CCPD final policymakers chose not to provide 40-millimeter launchers to police officers to allow them to safely disarm a mentally ill citizen such as Mojica in October 2019. As Assistant Chief Schauer stated about the 40-millimeter launchers *after* Mojica's death, "We are assigning them to officers to take in patrol cars and have that as a resource so they don't have to shoot someone." CCPD final policymakers were aware that this policy was the moving force behind excessive force against mentally ill citizens, including deadly force, because CCPD purchased 40-millimeter launchers and changed its policy after Mojica's death.

80. As well, CCPD final policymakers failed to provide other specific tools to police officers to handle recurring situations involving mentally ill citizens. Specifically, CCPD did not provide riot and ballistic shields, long recognized by law enforcement and already available tools to CCPD, which are highly effective against individuals with bats and knives.  CCPD final policymakers chose not to provide these easily available and cost-effective options to police officers, or require a supervisor to bring them to a call, involving

mentally ill citizens. Knowing to a moral certainty that a police officer may confront a mentally ill suspect that is carrying a knife, bat or similar weapon, a riot shield and/or ballistic shield protects the officer and allows the call to be resolved without unnecessarily escalating the situation to use deadly force.

81. Another example is that at the time of Mojica's death, the CCPD's policy was that officers were not allowed to carry beanbag launchers and officers were not required to call their supervisor to bring a beanbag launcher to a scene where force, including deadly force, is being considered relevant to a mentally ill citizen. Beanbag launchers are known as a safe and very effective non-lethal device especially compared to electric shock devices. CCPD has had beanbag launchers for quite some time and CCPD offers training on their use, but in the CCPD's policy, practice and custom, these beanbag launchers are not available to officers responding to calls especially when mental health issues, such as in Mojica's case, are implicated and for which their use would obviate unnecessary deadly force.

82. Likewise, according to Assistant Chief Schauer's interview, he remarked that "One of the obvious things was training. Better training to teach people more skills, how to slow things down with people who are having episodes." The article states that CCPD Police Academy cadets are also getting new training in de-escalation. Though de-escalation techniques have long been taught in the police academy, this class of cadets will utilize the latest training technology including in June 2020, cadets began using a training simulator that has three big TV screens that help train for different scenarios. "If we try to approach

someone too quickly, it escalates," he said. "It's meant to (teach) how are you going to react to what's going on, in addition to calling not only a supervisor but another officer. See what's going on, maintain distance, stage." However, there was no reference that this training is offered to current police officers or that the training was implemented prior to Mojica's death especially as it was a moral certainty that police officers are required to interact, seize and/or arrest individuals with mental health disabilities such as Mojica. As well, the fact that warrior/killology training is still available to and allowed by CCPD officers negates the effect of de-escalation training.

83. At the time of Mojica's death, CCPD employed policies, practices and customs that escalated the use of force where there were clear earlier junctures when the force could have been avoided or minimized, including but not limited to, using disengagement and de-escalation techniques, gathering information to potentially defuse the situation, and responding to these types of calls with specialized crisis intervention units or those trained in such techniques. As a result, persons who have mental illness and are in crisis are subjected to unnecessary or excessive force by police officers, such as Mojica in the present case.

84. A constitutional violation is a "highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations." *Bd. of Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 409 (1997) (citing *City of Canton v. Harris*, 489 U.S. 378, 390 n.10) ("For example, city policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons. . . . Thus, the

need to train officers in the constitutional limitations on the use of deadly force . . . can be said to be 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights.") (internal citations omitted). "[T]he existence of a pattern of tortious conduct by inadequately trained employees may tend to show that the lack of proper training, rather than a one-time negligent administration of the program or factors peculiar to the officer involved in a particular incident, is the 'moving force' behind the plaintiff's injury." *Id*. at 407-08 (citing *Canton*, 489 U.S. at 390-91). Plaintiffs pleaded in paragraph 53 *supra* a pattern of conduct and in paragraphs 75 and 76 *supra* the public statements of CCPD Assistant Chief Schauer and Officer Buckelew that support the City's knowledge of such a pattern of conduct and that to a moral certainty the City's police officers interact with and handle calls, seizures and arrests of mentally ill citizens. In June 2019, Officer Buckelew, the Crisis Intervention Officer, responded to five to eight calls a day. This supports that CCPD had knowledge of the frequency that mentally ill citizens are interacting with CCPD. It is also important to point out that, pursuant to CCPD policy, the Crisis Intervention Team was only on call from 7:00 a.m. to 11:00 p.m.   Therefore, this number of calls does not include the calls that occur over night.

85. To show city policymakers' notice and conscious disregard of the training and equipment deficiencies and ensuing constitutional violations, final policymakers for the City of Corpus Christi and CCPD had actual knowledge by recorded reports and discussions. Further, the final policymaking officials were aware through lawsuits of which the City Council and Chief of Police were aware, incident reports, investigations and

disciplinary decisions made by the Chief of Police.   Further, constructive knowledge may be evidenced by the fact that the practices have been so widespread and flagrant that in the proper exercise of its official responsibilities the final policymakers for the City of Corpus Christi and CCPD should have known of them such as set-out in paragraph 53 *supra*. Finally, knowledge of the pattern of constitutional violations by the final policymakers is supported by the fact that CCPD policies were changed after Mojica's death. "If a program does not prevent constitutional violations, municipal decision makers may eventually be put on notice that a new program is called for. Their continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action . . ." *Bryan Cnty.*, 520 U.S. at 407 (citing *Canton*, 489 U.S. at 390, 397).

86. Plaintiffs pleaded facts supporting the final policy-makers' deliberate indifference.

### F. CCPD's Policy, Practice and Custom Not to Offer Crisis Intervention is the Moving Force Behind Officer's Use of Excessive Force Including Deadly Force

87. In or about 2019, CCPD established a Crisis Intervention Team. The team consists of an officer trained in crisis intervention and a mental health worker. The team rides in a marked department vehicle and responds to calls for service involving people who may have mental health issues.

88. Throughout this deadly encounter, the officers were warned that Mojica had mental health problems. Despite this fact, CCPD chose a clear policy not to have crisis

intervention available after 11:00 p.m. which is the time at issue in this lawsuit.

89. The CCPD's Crisis Intervention Team only worked from 7:00 a.m. to 11:00 p.m. according to an article published in the Corpus Christi Caller Times on June 6, 2019 entitled Corpus Christi police's crisis intervention team is taking new approach to mental health. The City of Corpus Christi and CCPD knew to a moral certainty that crisis intervention involving mentally ill persons may occur at any time, especially during the overnight hours from 11:00 p.m. to 7:00 a.m. as did in Mojica's case. However, CCPD made a deliberate decision as its policy not to offer the Crisis Intervention Team's services during those hours.   This policy is the moving force behind excessive force being used against mentally ill citizens such as Mojica because it denies those services to mentally ill citizens who need them and which may save their life while they experience mental health crisis.

### G. CCPD's Policies, Practices and Customs Failed to Adequately Screen and Monitor Police Officers and This is the Moving Force Behind Police Officer's Use of Excessive Force Including Deadly Force

90. CCPD had a policy, practice and custom that it did not adequately scrutinize, screen and monitor police officers' work history, political allegiances and conduct.

91. A police officer is required to preserve, protect, and defend the Constitution and laws of the United States which includes the constitutional rights of citizens.

92.   Final policymaking officials for the City of Corpus Christi, including the City Council and Chief of Police know to a moral certainty that the City's police officers will interact with citizens and, in that interaction, the police officers must preserve, protect, and

defend the Constitution and laws of the United States which includes the constitutional rights of citizens.

93. Therefore, these final policymaking officials were required to adopt policies and to adequately screen and monitor police officers to ensure that an unfit officer will not be hired or retained, and that the unfit officer will, when placed in a particular position to affect the rights of citizens, act improperly.

94. In particular, police officers who are members of anti-government groups may not follow the Constitution and laws of the United States should not be hired. Officer Peterson identified "Uncle Sam's Misguided Children" as a former employer on social media. Uncle Sam's Misguided Children is identified by the Southern Poverty Law Center as an extreme anti-government group active since at least 2016.



95. Other examples of the City's failure to screen and monitor officers are Officer Hobbs who has repeatedly violated citizens' constitutional rights as set-out in paragraph 53, sections b., t. and aa.   Also, the City failed to monitor Officer Cantu's unconstitutional actions which resulted in the shooting of a sleeping citizen as set-out in paragraph 53, sections c and d. The City's failure to screen and monitor these officers is a moving force behind the constitutional violations of excessive force.

96. Hiring police officers that are members of or show allegiance to anti-government groups demonstrates that the City's decision reflects deliberate indifference to the risk that a violation of citizen's constitutional and statutory right will follow the decision. Adequate scrutiny of Officer Peterson's background would lead a reasonable policymaker to conclude that the plainly obvious consequence of the decision to hire him would be the deprivation of a third party's federally protected right because of his association with an anti-government group showing deliberate indifference.

## H. CCPD Policies, Practice, Custom and History of Failure to Accommodate Mojica's and Others Disabilities is the Moving Force Behind Police Officer's Use of Excessive Force Including Deadly Force

97. The City of Corpus Christi excluded Mojica from and denied him participation in the benefits of emergency medical response and law enforcement services, programs, or activities solely by reason of his mental disability by failing to make reasonable modifications in their policies, practices, or procedures to ensure him equal participation.

98. There should have been policies requiring de-escalation rather than escalation

of the situation, including but not limited to: providing a Crisis Intervention Team between the hours of 11:00 p.m. and 7:00 a.m.; providing supervisors who are appropriately trained in crisis intervention; requesting backup from supervisors who had riot and ballistic shields, beanbag launchers; backup from appropriate individuals who were appropriately trained in crisis intervention; eliminating unnecessary emergency lights and sirens; gathering information on Mojica from the individuals present at the scene; respecting the person's comfort zone; using nonthreatening communications when approaching Mojica; avoiding physical contact and maintaining the distance between them; retreating when given the opportunity; employing the passage of time to the officers' advantage; and using non-deadly force.

99. Defendant failed to reasonably accommodate Mojica's disability and failed to train and employ tactics that would have been likely to resolve the situation without injury to himself or others, causing him to suffer greater injury and death in that process compared to other arrestees or subjects in his position.

100. There was no emergent countervailing concern to employing these reasonable accommodations, as Mojica was alone in front of the house and not a danger to others at that time.

101. The exclusion, denial of benefits, and/or discrimination against Mojica was by reason of his recognized disability.

102. CCPD violated the Fourth Amendment and/or Title II of the Americans with Disabilities Act (hereinafter "ADA") on the grounds that the City failed to reasonably

accommodate Mojica's disability, and other similarly situated mentally ill citizens, and denied to Mojica, and other similarly situated mentally ill citizens, the benefits of the City's services, programs, and activities by (a) failing to properly train, supervise, and discipline police officers regarding crisis intervention techniques; (b) by policy not providing crisis intervention team members between 11:00 p.m. and 7:00 a.m. daily; (c) allowing warrior/killology training of officers; (d) failing to provide beanbag launchers, 40 millimeter launchers, and/or riot and ballistic shields; (e) failure to provide appropriate medical care; (f) otherwise providing insufficient resources; and (e) failing to follow established policies and procedures regarding crisis intervention techniques for individuals with mental health disabilities. The claims for disability discrimination under the ADA is discussed in greater detail *infra*.

### I. CCPD's BOLO Policy, Practice and Custom is the Moving Force Behind Constitutional Violations of Excessive Force and Deadly Force

103. CCPD's policy is that a police officer may issue a BOLO solely at his or her discretion without review of a supervisor.   By allowing a police officer to issue a BOLO without supervisor review, an officer creates a dangerous situation for individuals that may fit the description of the BOLO and who are then subjected to unlawful force such as what occurred to Richard Salazar, discussed in paragraph 53.c., and what occurred to Mojica.

104. A BOLO is important to distinguish because it places law enforcement on a heightened state of alert and it "pumps-up" the responding officer(s) in anticipation of what will be faced based upon the alert. By being "pumped-up", the officer is more likely and

primed to face the threat and use excessive force, including deadly force, especially in light of warrier/killology training.

105. CCPD's BOLO policy is the moving force behind excessive and deadly force because it allows an individual officer to create an unnecessarily dangerous situation for an individual or individuals, such as Mojica and Richard Salazar, when a supervisor should review and implement the BOLO to ensure that the facts are correct and appropriately stated to identify the specific individual and that a dangerous situation is not unnecessarily created as was for Mojica and Richard Salazar.

### J. CCPD's Policy, Practice, Customs and Training Does Not Require Police Officers to Reduce Force Once a Suspect is Subdued and This is the Moving Force Behind Officer's Use of Excessive Force Including Deadly Force

106. It was clearly established law that force must be reduced once a suspect has been subdued. *See, e.g*. *Joseph ex rel. Est. of Joseph v. Bartlett*, 981 F.3d 319, 333–34 (5th Cir. 2020) *citing Cooper v. Brown*, 844 F.3d 517, 524 (5th Cir. 2016). Notably, "subdued" does not mean "handcuffed." *Id*. If the suspect lacks any means of evading custody-for example, by being pinned to the ground by multiple police officers-force is not justified. So even if Mojica failed to comply with the officers at certain points throughout the encounter, that resistance did not justify force indefinitely. *Id*. When Officer Peterson fired the final two gunshots, Mojica would have appeared incapacitated to an objectively reasonable officer, and deadly force unconstitutional when Mojica posed no immediate threat. *Id citing Mason v. Lafayette City-Parish Consol. Gov't*, 806 F.3d 268 (5th Cir.

2015). Another very important fact is that Officer Peterson was the *only* officer to use deadly force.  If deadly force was reasonable under the circumstances, all four officers would have exercised it.

107.   CCPD's policies, practices, customs and training does not meet this standard by not requiring officers to reduce force once a suspect is subdued and this is the moving force behind excessive and deadly force being unlawfully used against citizens such as Mojica.

### K. CCPD's Policy, Practice, Customs and Training Does Not Require Officers to Use Force "with Measured and Ascending Actions that correspond to [a suspect's] escalating Verbal and Physical Resistance" and This is the Moving Force Behind Police Officer's Use of Excessive Force Including Deadly Force

108.   At the time of the events made the basis of this lawsuit, the Fifth Circuit Court of Appeals clearly established that an officer must assess not only the need for force, but also 'the relationship between the need and the amount of force used.' *Joseph ex rel. Est. of Joseph v. Bartlett*, 981 F.3d 319, 333–34 (5th Cir. 2020) citing *Deville v. Marcantel*, 567 F.3d 156, 167 (2009) (per curiam).   The timing, amount, and form of a suspect's resistance are key to determining whether the force used by an officer was appropriate or excessive. *Id*. citing *Curran v. Aleshire*, 800 F.3d 656, 661 (5th Cir. 2015) ("A suspect's active resistance is a key factor in the Fourth Amendment's 'objective reasonableness' test."). See also *Mason v. Lafayette City-Par. Consol. Gov't* , 806 F.3d 268, 277 (5th Cir. 2015) ("[A]n exercise of force that is reasonable at one moment can become unreasonable in the next if the justification for the use of force has ceased." (*quoting Lytle v. Bexar Cty*., 560 F.3d 404,

413 (5th Cir. 2009)). While "a suspect's refusal to comply with instructions" may indicate that physical force is justified, officers must also select the appropriate "*degree* of force." *Id*. *citing Deville*, 567 F.3d at 167–68. To stay within constitutional bounds, an officer must use force "with measured and ascending actions that correspond to [a suspect's] escalating verbal and physical resistance." *Id*. *citing Poole v. City of Shreveport*, 691 F.3d 624, 629 (5th Cir. 2012).   As to a passively resisting suspect, an officer does not take measured and ascending action by "immediately resort[ing] to taser and nightstick without attempting to use physical skill, negotiation, or even commands." *Id*. citing *Newman v. Guedry* , 703 F.3d 757, 763 (5th Cir. 2012); *accord Brothers v. Zoss* , 837 F.3d 513, 520 (5th Cir. 2016) ("[W]e have placed weight on the quickness with which law enforcement personnel have escalated from negotiation to force." (*citing Newman* , 703 F.3d at 763 ; *Deville* , 567 F.3d at 167–68 )).

109. In the present case, the Officers did not take "measured and ascending actions that corresponded to Mojica's verbal and physical resistance as they rushed to excessive force, the taser, and deadly force, gunshots, prior to trying to using lower levels of force especially as Mojica's actions were not threatening to the officers or the public.

110. Despite being clearly established law, CCPD's policies, practices, customs and training did not require that officers act "with measured and ascending actions that correspond to [a suspect's] escalating verbal and physical resistance." This is the moving force behind the constitutional violation of excessive force suffered by Mojica and others similarly situated.

### L. CCPD's Policies, Practices, Customs and Training do not Prohibit the Use of Deadly Force Against Individuals Who Pose a Danger Only to Themselves and This is the Moving Force Behind Police Officer's Use of Excessive Force Including Deadly Force

111. CCPD policies and training do not prohibit the use of deadly force against individuals who pose a danger only to themselves. According to the Guiding Principles On Use of Force published in 2016 by the Police Executive Research Form and considered by the Corpus Christi Police Officer's Association, agencies should prohibit the use of deadly force, and carefully consider the use of many less-lethal options, against individuals who pose a danger only to themselves and not to other members of the public or to officers. Officers should be prepared to exercise considerable discretion to wait as long as necessary so that the situation can be resolved peacefully.

112. Especially in light of the pattern of events set-out in paragraph 53 supra and the Corpus Christi Police Officer Association's consideration of this issue, CCPD's failing to adopt this policy and training is the moving force behind the use of excessive and deadly force against citizens such as Mojica.

### M. CCPD's Practices and Customs are that Officers Use Cover-up Charges as Justification for the Use of Excessive and Deadly Force and This is the Moving Force Behind Police Officer's Use of Excessive Force Including Deadly Force

113. It is the practice and custom of CCPD officers to use "cover charges" against the victim of excessive and deadly force. These "cover charges" are a way to cover up unlawful conduct and justify their excessive use of force.

114. This occurred in the present case by Mojica being charged with aggravated

assault on a peace officer, Officer Peterson. Other examples are found in paragraph 53

*supra* and include [as referenced by their corresponding section]:

> f. January 8, 2018: Stephen Ambriz, a Hispanic male, who was charged with with assault on a public servant and interference with public duties. Currently, there is no record of these charges with the Nueces County District Clerk.

> g. October 19, 2017: Dewboy Lister, a Black 55-year-old male, was charged with several crimes. The Peace Officer Death or Injuries Report specifically stated that the victim [Lister] did not carry, exhibit or use a deadly weapon.

> i. Oct. 30, 2016: Jordan Love Gonzalez, a Hispanic male, was charged with several crimes.

> m. February 19, 2015: Ray Rosas, a Hispanic male, was arrested and charged with three counts of attempted capital murder. He remained in solitary confinement for approximately two years. The family essentially lost their home and were left destitute. The jury found Rosas "Not Guilty" on all counts.

> p. December 29, 2013: Mary Zuniga, a Hispanic female, was charged with assault on a police officer and a jury acquitted her.

> q. November 15, 2013: German Roca, a Hispanic male, was charged with public intoxication. The charges were later dismissed.

> s. May 21, 2012: Roderick Hornsby, a Black male, was charged with disorderly conduct. All charges against Hornsby were dismissed/dropped.

> bb. April 25, 2010: Fabian Pulido, a Hispanic male, was arrested and charged with Public Intoxication. When Pulido asked why the Officers were beating him, they said he was resisting; however, no charge was ever filed against him for resisting.

> cc. April 15, 2010: John Michael Hogan was arrested and charged with assault on a peace officer. This charge was not pursued by the Nueces County District Attorney's Office.

> ee. September 5, 2009: Pedro Cortez Gonzalez, a Hispanic male, was charged

with assault resulting in bodily injury and a jury returned not guilty verdicts and a charge of resisting arrest, search or transport was dismissed by the Nueces County District Attorney's Office.

gg. October 1, 2008: Claudius Alexander, a Black male, was arrested for evading arrest/detention and driving erratically. Alexander was unable to stand because of his health conditions and he was released without being charged.

115. The policy, practice and custom of allowing "cover charges" is the moving force behind constitutional violations of excessive and deadly force as it allows the officer to hide behind a trumped-up charge as legal justification for the unconstitutional action. CCPD fails to investigate and discipline these officers for these "cover charges" thereby ratifying their conduct, accepting the practice and custom, and sending a clear message to all officers that this is within the CCPD's policies.

**N. CCPD's Policies, Practices, Customs and Training Do Not Instruct That Officers May Not Unreasonably Create the Need for the Use of Force Including Deadly Force and This is the Moving Force Behind Police Officer's Use of Excessive Force Including Deadly Force**

116. Officer Peterson, Officer Contreras, Officer Rodgers and Officer Leal's police officer's use of force was "unreasonably created" by escalating the situation resulting in the use of deadly force and Mojica's death. *Mason v. Lafayette City-Parish Consol. Gov't*, 806 F.3d 268 (5th Cir. 2015), *Edmond v. City of New Orleans*, 20 F.3d 1170, (5th Cir. 1994) (precedential under 5th Cir. R. 47.5.3); see also Bazan v. Hidalgo Cnty., 246 F.3d 481, 493 (5th Cir. 2001) (holding that earlier events "set the stage for what followed," and that factual disputes regarding those events were material).

117. The City of Corpus Christi does not have a policy or training that instructs officers that they may not unreasonably create the need for the use of force including deadly force.   The failure of the City of Corpus Christi to have such a policy and training is the moving force of constitutional violations of excessive and deadly force.

## V. CLAIMS

### A.   42 U.S.C. §1983 - Fourth Amendment (Excessive Force – Unlawful Seizure/Wrongful Death)

#### 1. Background

118. Plaintiffs incorporate by reference the allegations set-out in paragraphs 1-117 of this Complaint as if fully set-out herein.

119. Plaintiffs plead this claim in the alternative as allowed under FRCP 8 to the extent the facts of this claim and the other claims in this lawsuit are inconsistent.

120. Plaintiffs brings claims for violations of Mojica's rights under 42 U.S.C. §1983 - Fourth Amendment (Excessive Force – Unlawful Seizure/Wrongful Death), against the following Defendants:

Defendant Municipality: City of Corpus Christi

Employees of the City of Corpus Christi who are individual defendants acting under color of state law for purposes of 42 U.S.C. § 1983: Officer Peterson, in his individual capacity, Officer Contreras, in his individual capacity, Officer Rodgers, in his individual capacity, and Officer Leal, in his individual capacity.

121.   Section 1983 of the Civil Rights of 1871, 42 U.S.C. § 1983, prohibits any person acting under color of state law from depriving any citizen or person of the rights,

privileges and immunities secured by the Constitution.

122. The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." U.S. Const. amend. IV.

123. The law has been clearly established that the Fourth Amendment creates a "right to be free from excessive force during a seizure." *Poole v. City of Shreveport*, 691 F.3d 624, 627 (5th Cir. 2012); accord U.S. Const. amend. IV. "To establish a claim of excessive force under the Fourth Amendment, plaintiffs must demonstrate: '(1) injury, (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable.'" *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009) (*quoting Tarver v. City of Edna*, 410 F.3d 745, 751 (5th Cir. 2005)).

124. However, officers are not justified in using deadly force unless objectively reasonable officers in the same position "would have had probable cause to believe that there was a threat of serious physical harm to themselves or to others." *Thomson v. Salt Lake Cty.*, 584 F.3d 1304, 1313 (10th Cir. 2009) (internal quotation marks, emphasis omitted); *see also Kisela*, 138 S. Ct. at 1152 (*discussing Tennessee v. Garner*, 471 U.S. 1, 11 (1985)).

125. At the time of the actions made the basis of this lawsuit, Mojica clearly had rights under the Fourth Amendment to the United States Constitution from excessive force from the acts of those "acting under color of state law" related to seizures and/or arrests. At issue in this case are the tasings by Officer Peterson, Officer Contreras, Officer Rodgers

and Officer Leal and the gunshots by Officer Peterson which caused serious bodily injury

to Mojica ultimately leading to his death.

## 2. Claims against the City of Corpus Christi

126. Plaintiffs' claim that the City of Corpus Christi violated Mojica's Fourth

Amendment right to be protected from excessive and unnecessary force.

127. To establish municipal liability, a plaintiff must prove three elements: (1) a

policymaker; (2) an official policy; and (3) a violation of constitutional rights whose

"moving force" is the formal policy or custom. *Monell v. N.Y. City Dept. of Social Servs.,*

436 U.S. 658, 694, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978).

128. For purposes of 42 U.S.C. §1983 official government policy includes:

(1) official decisions promulgated by a local government's lawmaking body;
(2) longstanding practices so persistent and widespread as to fairly represent
government policy or the force of law; and
(3) the acts or policies of officials who by law or delegation possess final
policymaking authority for the local government concerning the action
alleged to have caused the particular constitutional or statutory violation at
issue.

*See Pembaur v. Cincinnati*, 475 U.S. 469, 480-81 (1986), 475 U.S. at 480-81; *Monell v.*

*New York City Dep't of Social Servs.,* 436 U.S. 658, 691 (1978); *Adickes v. S.H. Kress &*

*Co.*, 398 U.S.144, 167-68 (1970).

129. The City Council, City Manager and Chief of Police for the City of Corpus

Christi had final policymaking authority for the City's Police Department.

130. The Fourth Amendment to the Constitution of the United States protects citizens like Mojica from unreasonable searches and seizures, including excessive and unnecessary force.

131. A municipality is not liable for the actions of its employees unless the constitutional violation was caused by a county's policy or custom.

132. Plaintiffs have specifically pleaded numerous examples of policies adopted and maintained in deliberate indifference of citizen rights, including Mojica, in this complaint in Sections which are incorporated herein by reference and these policies are the moving force behind excessive force such as what occurred to Mojica:

C. CCPD's Policy, Practice and Custom to Quickly Resolve Calls is the Moving Force Behind Officer's Use of Excessive Force Including Deadly Force

D. CCPD's Policy, Practice, Custom and History of Providing and Permitting Warrior/Killology Training is the Moving Force Behind Police Officer's use of Excessive Force Including Deadly Force

E. CCPD's Policy, Practice and Custom of Inaction and Failure to Provide Policies, Equipment and Training to Police Officers to Handle Recurring Mental Health Situations is the Moving Force Behind Officer's Use of Excessive and Deadly Force

F. CCPD's Policy, Practice and Custom Not to Offer Crisis Intervention is the Moving Force Behind Officer's Use of Excessive Force Including Deadly Force

G. CCPD's Policies, Practices and Customs Failed to Adequately Screen and Monitor Police Officers and This is the Moving Force Behind Police Officer's Use of Excessive Force Including Deadly Force

H. CCPD's Policy, Practice, Custom and History of Failure to Accommodate Mojica's and Others Disabilities and This is the Moving Force Behind Police

Officer's Use of Excessive Force Including Deadly Force

I. CCPD's BOLO Policy, Practice and Custom is the Moving Force Behind Constitutional Violations of Excessive Force and Deadly Force

J. CCPD's Policy, Practice, Custom and Training Does Not Require Officers to Reduce Force Once a Suspect is Subdued and This is the Moving Force Behind Police Officer's Use of Excessive Force Including Deadly Force

K. CCPD's Policy, Practice, Customs and Training Does Not Require Officers to Use Force "with Measured and Ascending Actions that correspond to [a suspect's] escalating Verbal and Physical Resistance" and This is the Moving Force Behind Police Officer's Use of Excessive Force Including Deadly Force

L. CCPD's Policies, Practices, Customs and Training do not Prohibit the Use of Deadly Force Against Individuals Who Pose a Danger Only to Themselves and This is the Moving Force Behind Police Officer's Use of Excessive Force Including Deadly Force

M. CCPD's Practices and Customs are that Officers Use Cover-up Charges as Justification for the Use of Excessive and Deadly Force and This is the Moving Force Behind Police Officer's Use of Excessive Force Including Deadly Force

N. CCPD's Policies, Practice, Customs and Training Do Not Instruct That Officers May Not Unreasonably Create the Need for the Use of Force Including Deadly Force and This is the Moving Force Behind Police Officer's Use of Excessive Force Including Deadly Force

133. Also, Plaintiffs pleaded numerous examples of facts and situations which placed the City of Corpus Christi and its final policymaking officials, City Council and Police Chiefs, on notice of the customs and practices which led to violations of excessive force and deadly force, including in Mojica's case. These instances were pleaded in paragraph 53, CCPD's Practice and Custom of Use of Excessive and/or Deadly Force When Not Legally Justified and in Non-Deadly Circumstances Especially Involving

Mentally Ill Males of Color.

134. The City of Corpus Christi failed to properly train or modify its training provided to the Defendant Officers and its other officers, including but not limited to, matters related to the reasonable and appropriate use of force during such arrests, and intervention in the excessive use of force by fellow officers. This failure to properly train and to modify its training is the moving force behind the constitutional violations of excessive force suffered by Mojica.

135. Responding to calls involving mental health crisis, effectuating an arrest, using force to effectuate an arrest, and intervening in the use of force is a usual and recurring situation with which Corpus Christi law enforcement officers encounter on a regular basis.

136. While an unconstitutional official policy renders a municipality culpable under §1983, even a facially innocuous policy will support liability if it was promulgated with deliberate indifference to the `known or obvious consequences' that constitutional violations would result. *Balle*, 952 F.3d at 558, citing *Piotrowski v. City of Hous.,* 237 F.3d 567, 579 (5th Cir. 2001) (quoting *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 407 (1997).

137. The City of Corpus Christi is also liable based upon the theory of ratification. A municipality may be held liable for a single act or decision of a final policymaker, as when a municipality's properly constituted legislative body approves and executes a single unconstitutional decision. *See Jett v. Dallas Indep. Sch. Dist*., 491 U.S. 701, 737 (1989); *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988) (plurality

opinion); *Pembaur*, 475 U.S. at 480. For example, when a subordinate's decision is subject to review by the municipality's authorized policymakers, they have retained the authority to measure the official's conduct for conformance with *their* policies. If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988) (plurality opinion). As set-out herein, Police Chief Mike Markle retained the authority to measure Officer Peterson, Officer Contreras, Officer Rodgers and Officer Leal's actions and decisions, and other actions made the basis of this complaint, and approved of those decisions, thereby ratifying the conduct and making the final decision on behalf of the City of Corpus Christi, Texas and supporting that the conduct of Officer Peterson, Officer Contreras, Officer Rodgers and Officer Leal's and others involved in the incidents made the basis of this lawsuit conformed to policy, practices and customs implemented by these final policymaking officials for the City of Corpus Christi and CCPD.

### 3. Claims against Officer Peterson, Officer Contreras, Officer Rodgers and Officer Leal

138. The tasings by Officer Peterson, Officer Contreras, Officer Rodgers and Officer Leal, in their individual capacities, and the gunshots by Officer Peterson, in his individual capacity, which caused serious bodily injury to Mojica ultimately leading to his death were objectively unreasonable as set out specifically in paragraphs 1-117 herein and their actions and inactions were the proximate cause of Mojica's injuries and death. These

Defendants do not have qualified immunity because the law related to excessive force under the Fourth Amendment relative to the facts of this case was clearly established at the time of the events made the basis of this lawsuit.

139. The actions of Officer Peterson, Officer Contreras, Officer Rodgers and Officer Leal, individually, are acts under color of state law as they were police officers employed by the City of Corpus Christi in the CCPD to work as patrol officers responding to calls for police from Corpus Christi citizens.

140. Mojica did nothing to invite or in any other manner give any legal justification for the assaults and violations of excessive force that are raised in this lawsuit. Officers Peterson, Contreras, Rodgers and Leal intentionally assaulted Mojica by tasing him and Officer Peterson shooting him with a gun 3 times without legal justification causing him serious bodily injury ultimately resulting in death. The force and actions each took relative to Mojica were objectively unreasonable and a reasonable officer possessing Officer Peterson, Officer Contreras, Officer Rodgers and Officer Leal's knowledge of the circumstances at the scene would have viewed the violations of seizure and/or arrest as unreasonable or excessive.

141. The U.S. Supreme Court has established the *Graham* factors in determining reasonable force, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest flight.'" *Graham v. Connor*, 490 U.S. 386, 396 (1989).

142. In this case, the facts indicate that the intrusion on Mojica's Fourth Amendment interests outweighed the Officers' interest in exerting force, the tasers, and deadly force, and the 3 gunshots. In regard to the first factor, there was no crime. Mojica was having a mental health crisis and the police were called on a non-emergency line to help diffuse the situation.   In consideration of the second factor, Mojica did not pose an immediate threat to the safety of the officers or others.   Mojica was a rather small person, he had a child's t-ball bat, he was not threatening anyone with the bat, family and others were inside the house and Mojica was outside.   It was only after the Officers aggravated Mojica and went toward him yelling commands, rather than de-escalate the situation, that Mojica began to walk from his house as he was being shadowed by the Officers. This relates to the final factor. Mojica was not evading the police, he was suffering a mental health crisis.   Mojica was simply walking with the Officers as they surrounded him.

143. Officer Peterson, Officer Contreras, Officer Rodgers and Officer Leal's police officer's use of force was "unreasonably created" resulting in the use of deadly force and Mojica's death.   *Mason v. Lafayette City-Parish Consol. Gov't*, 806 F.3d 268 (Cir. 2015), *Edmond v. City of New Orleans*, 20 F.3d 1170,  (5th Cir. 1994) (precedential under 5th Cir. R. 47.5.3); *see also Bazan*, 246 F.3d 481, 493 (5th Cir. 2001) (holding that earlier events "set the stage for what followed," and that factual disputes regarding those events were material).

144. Plaintiffs also make a claim against Officer Peterson, Officer Contreras, Officer Rodgers and Officer Leal for bystander liability because (1) each knew that a fellow

officer was violating Mojica's constitutional rights related to excessive force and the use of a taser and gunshots that occurred; (2) each had a reasonable opportunity to prevent the harm; and (3) each chose not to act and allowed Mojica to be tased, shot and killed. *Kitchen v. Dallas County*, 759 F.3d 468, 480 (5th Cir.2014) (quoting *Whitley v. Hanna*, 726 F.3d 631, 646–47 (5th Cir. 2013)), *abrogated on other grounds by Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015).

## B. Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132

145. Plaintiffs repeat and reallege the preceding paragraphs, 1-117, as if fully set forth in this Count.

146. Plaintiffs plead this claim in the alternative as allowed under FRCP 8 to the extent the facts and law of this claim and his other claims in this lawsuit are inconsistent.

147. This claim is alleged against the City of Corpus Christi, Texas.

148. Section 12132 of the ADA provides, "Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. A "public entity" is defined as "(A) any State or local government" or "(B) any department, agency, special purpose district, or other instrumentality of a State or States or local government." 42 U.S.C. § 12131(1).

149. Mojica had mental health disabilities including depression and was a qualified person with a disability under the Americans with Disabilities Act, and his disability was known to the Defendant as it was relayed during the non-emergency call that Mojica had a mental health issue and the police placed a BOLO of a "suicide by cop" relevant to the facts made the basis of this lawsuit. Mojica was an individual with a disability within the meaning of 42 U.S.C. §12131(2).

150. Mojica's serious mental illness constitutes mental impairments that substantially limit him in several major life activities, including but not limited to manual tasks, seeing, hearing, eating, sleeping, speaking, learning, reading, concentrating, thinking, communicating, and working. Defendant was aware of Mojica's disability as it was well documented by the non-emergency call made by Mojica's Uncle and there had been previous police calls to the residence related to Mojica's mental health. Further, the police placed a BOLO of a "suicide by cop" relevant to the facts made the basis of this lawsuit. As a result, the Defendant had an obligation to accommodate his disability by providing him with appropriate accommodations. The Defendant intentionally failed to accommodate Mojica's mental health disability, and these failures led to Mojica's assault, serious bodily injury, death.

151. Discriminatory arrests and brutal treatment are unlawful police activities. The general regulatory obligation to modify policies, practices, or procedures requires law enforcement to make changes in policies that result in discriminatory arrests or abuse of individuals with disabilities. Under, Title II of the ADA, § 35.130 General prohibitions

against discrimination, this section requires law enforcement personnel to make appropriate efforts to determine whether perceived strange or disruptive behavior or unconsciousness is the result of a disability.

152. The City of Corpus Christi is a public entity as that term is used in 42 U.S.C. §12131(1).

153. A public entity's failure to reasonably accommodate the known limitations of persons with disabilities can constitute disability discrimination under Title II. *See Bennett-Nelson v. La. Bd. of Regents*, 431 F.3d 448, 454 & n.11 (5th Cir. 2005) ("[Title II] impose[s] upon public entities an affirmative obligation to make reasonable accommodations for disabled individuals"); *Bennett-Nelson v. La. Bd. of Regents*, 431 F.3d 448, 454 (5th Cir. 2005); *Jin Choi v. Univ. of Tex. Health Sci. Ctr. at San Antonio,* 633 Fed.Appx. 214, 215 (5th Cir. 2015) (adapting failure-to-accommodate standard from Title I to Title II); *Ball v. LeBlanc,* 792 F.3d 584, 596 n.9 (5th Cir. 2015) (same)).

154. Whether Mojica's mental health condition left him incapable of explicitly requesting an accommodation is immaterial. "Where the defendant otherwise had knowledge of the individual's disability and needs but took no action," not even the failure to expressly request a specific accommodation (or modification) fatally undermines an ADA claim. *Greer v. Richardson Indep. Sch. Dist.*, 472 Fed.Appx. 287, 296 (5th Cir. 2012); *Borum v. Swisher Cnty.*, No. 2:14–CV–127–J, 2015 WL 327508, at *9 (N.D. Tex. Jan. 26, 2015); *Hinojosa v. Livingston*, 994 F.Supp.2d 840, 843–44 (S.D. Tex. 2014). It was open and obvious that Mojica had a mental health disability to the CCPD and its

officers because the police themselves documented that Mojica allegedly threatened suicide by cop; Mojica's uncle relayed that Mojica was experiencing mental difficulties in the non-emergency call at issue in this lawsuit and there had been previous calls to the residence because of Mojica's mental health conditions.   These facts support that Mojica's condition was open, obvious and apparent and CCPD knew of the need for reasonable accommodations for his disability.

155. Government entities are liable for the "vicarious acts of any of [their] employees" that violate the ADA or Rehabilitation Act. *Delano–Pyle v. Victoria County*., 302 F.3d 567, 574–75 (5th Cir. 2002). "[T]he ADA, unlike section 1983…contemplates *respondeat superior* liability for the public entity based on the actions of its employees *and agents*." *Pena v. Bexar County*, 726 F.Supp.2d 675, 686 (W.D. Tex. 2010).

156. Mojica was entitled to be free from discrimination under the Americans with Disabilities Act, 42 U.S.C. §12131 *et seq.* Defendant failed to accommodate Mojica's mental disabilities and denied him the benefits and services by reason of his disabilities and intentionally discriminated against him because of his disability as set-out *supra* in paragraphs 1-117.

157. Through the events identified in paragraph 53 *supra* and by the comments made during Assistant Chief Schauer's interview in August 2020 and Officer Buckelew's interview in June 2019, at the time of Mojica's death the City had knowledge that mentally disabled citizens were not being accommodated through things like de-escalation, officer training related to mental health disabilities and alternative use of less lethal force such as

the 40 millimeter launchers which were only assigned to officers after Mojica's death, "to take in patrol cars and have that as a resource so they don't have to shoot someone," Schauer said. Further, after Mojica's death, the CCPD provided police academy cadets new training in de-escalation which involved a $140,000 simulator that has three big TV screens that help train for different scenarios.

158. Finally, the City of Corpus Christi is vicariously liable for the acts of its employees, Officer Peterson, Officer Contreras, Officer Rodgers and Officer Leal as set-out in paragraphs 1-117 as they were aware of Mojica's mental health disability as they were responding to an alleged "suicide by cop" event for which the police themselves issued a BOLO. Officer Peterson, Officer Contreras, Officer Rodgers and Officer Leal each intentionally violated Mojica's rights by intentionally assaulting him by taser because of Mojica's disabilities. Officer Peterson intentionally shot Mojica with the intent to kill Mojica because of his disabilities. The final insult is that knowing all of the facts related to Mojica's death, the Chief of Police dismissed these clear facts of disability discrimination and civil rights violations against Mojica and ratified Officer Peterson, Officer Contreras, Officer Rodgers and Officer Leal's unlawful conduct.   These facts also support intentional discrimination and that compensatory damages are merited.

160. Plaintiffs seek all damages available under law, including, but not limited to actual damages, compensatory damages, attorney's fees and other relief, for the intentional violation of Mojica's rights and the discrimination that he suffered in violation of the Americans with Disabilities Act.

## VI. Damages

### a. Survival

161. The preceding allegations and claims in this pleading, paragraphs 1-158, are incorporated herein as if each was restated and re-alleged in its entirety.

162. As a direct and proximate result of Defendants' violations of the claims set-out herein and incorporated by reference, Mojica suffered severe and permanent injuries and damages, severe shock, extreme and excruciating physical pain and mental suffering, including, but not limited to, fear of impending death, conscious pre-death fear and apprehension of impending death, loss of enjoyment of life, physical and emotional pain, severe emotional distress, aggravation, inconvenience, humiliation, shame, shock, funeral and burial expenses and loss of income and earnings up and until the time of his death. Plaintiffs seek an award of damages for these damages against all Defendants.

### b. Wrongful Death

163. As a direct and proximate result of Defendants' violations for the claims set-out herein and incorporated by reference, Ms. Garza and Mr. Mojica have been deprived of the services, comfort of his society and companionship as well as other pleasures and rights that have pecuniary value, which attend to immediate family relationships. Plaintiffs have experienced emotional pain and suffering as a result of the death of their son, Emilio Mojica.   Plaintiffs seeks an award of damages for these damages against all Defendants.

### c. Punitive and/or Exemplary Damages

164. The actions and omissions of Defendants sued in their individual capacity: Officer Peterson, Officer Contreras, Officer Rodgers and Officer Leal identified herein were unlawful, unconstitutional, shocking to the conscience, and were performed maliciously, recklessly, fraudulently, sadistically, intentionally, willfully, wantonly and in complete and utter disregard of Mojica's constitutional rights and privileges guaranteed to Mojica pursuant to 42 U.S.C. §1983. Defendants' outrageous and unconscionable conduct warrants an award of exemplary and punitive damages in an amount appropriate to punish and make an example of Defendants and deter Defendants and others from like conduct in the future. Plaintiffs seek an award of damages for these damages against Defendants.

### VII. Section 1988 – Attorney's Fees

165.   The preceding allegations in the Facts portion of this pleading are incorporated herein as if each was restated and re-alleged in its entirety.

166. Plaintiffs allege this count against the City of Corpus Christi, Texas; Officer Peterson, in his individual capacity, Officer Contreras, in his individual capacity, Officer Rodgers, in his individual capacity, and Officer Leal, in his individual capacity.

167. Because the actions of Defendants, City of Corpus Christi, Texas; Officer Peterson, in his individual capacity, Officer Contreras, in his individual capacity, Officer Rodgers, in his individual capacity, and Officer Leal, in his individual capacity were taken under color of state law to deprive Mojica of his rights under the Fourth Amendment to the United States Constitution and his civil rights under §1983, Plaintiffs had to obtain the

services of Bryan K. Harris PC and the Law Office of Gay E. Gilson to vindicate the violation of his constitutional and civil rights and has therefore incurred attorneys' fees.

168.   Pursuant to 42 U.S.C. §1988, Plaintiffs assert their claim for attorneys' fees against the City of Corpus Christi, Texas; Officer Peterson, in his individual capacity; Officer Contreras in his individual capacity; Officer Rodgers in his individual capacity; Officer Leal, in his individual capacity if they prevail in their claims under §1983.

### Jury Trial Requested

169. Plaintiffs request a trial by jury.

### Prayer

170. WHEREFORE, Plaintiffs pray that the Court enter judgment in their favor and against Defendants, jointly and severally, and award the following:

a. Survival damages;

b. Wrongful death damages;

c. Punitive and/or exemplary damages as allowed by law against the Defendants;

d. Prejudgment interest as allowed by law;

e. Post-judgment interest as allowed by law;

f. Attorney fees and costs under 42 U.S.C. §1988(b);

g. All relief as allowed under the Americans with Disabilities Act, including, but not limited to compensatory damages;

h. Attorney's fees, including litigation expenses, and costs as allowed by law;

i. Court costs and expenses as allowed by law;

74

j. Such other legal or equitable relief ultimately justified by the proof of this case.

**Respectfully submitted,**

*/s/ Robert J. Sigler*

By: _____

Robert J. Sigler
Texas State Bar No. 18347750
BRYAN K. HARRIS, P.C.
5262 SOUTH STAPLES, SUITE 100
CORPUS CHRISTI, TEXAS  78411
TELEPHONE: (361) 992-9646
FACSIMILE: (361) 992-9671
**Attorney for Plaintiffs**

**OF COUNSEL**:

Gay Gilson
Law Office of Gay E. Gilson
5525 S. Staples, Suite B3
Corpus Christi, Texas 78411
TEL 361-887-0552
FAX 361-887-0554
SBN 00784131/Fed I.D. 16385
Email: gegilson@gilsonlaw.com